Filed: February 17, 1999

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 97-2753(L)
(CA-96-815-3)

Hitachi Credit America Corporation,

Plaintiff - Appellee,

versus

Signet Bank, etc., et al,

Defendants - Appellants.

O R D E R

The court amends its opinion filed January 19, 1999, as follows:

On page 5, footnote 2, line 2 -- the word "related" is corrected to read "relate."

On page 8, first full paragraph, line 4 -- "December Assignment Agreement" is corrected to read "Assignment Agreement."

On page 13, second full paragraph, line 8 -- the words "qualifier 'to the'; that the 'any similar ....'" are corrected to read "qualifier 'to the best' and that the 'any similar ....'"

On page 16, second full paragraph, lines 3 and 15 -- the phrase "Assignment Agreement" is corrected to read "December Assignment Agreement."

On page 18, first full paragraph, line 12 -- the phrase "Assignment Agreement" is corrected to read "December Assignment Agreement."

On page 24, second full paragraph, line 3 -- the words "alleged that Hitachi" are corrected to read "that Hitachi."

On page 24, footnote 9, lines 17-18 -- the cross-reference to "See ante at 20" is deleted.

On page 27, first paragraph, line 3 -- the cross-reference to "see ante at 17-23" is deleted.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

HITACHI CREDIT AMERICA
CORPORATION,
Plaintiff-Appellee,

v.

No. 97-2753

SIGNET BANK, formerly known as
Signet Bank/Virginia; SIGNET
LEASING AND FINANCIAL
CORPORATION,
Defendants-Appellants.

HITACHI CREDIT AMERICA
CORPORATION,
Plaintiff-Appellant,

v.

No. 97-2754

SIGNET BANK, formerly known as
Signet Bank/Virginia; SIGNET
LEASING AND FINANCIAL
CORPORATION,
Defendants-Appellees.

Appeals from the United States District Court
for the Eastern District of Virginia, at Richmond.
James R. Spencer, District Judge.
(CA-96-815-3)

Argued: October 27, 1998

Decided: January 19, 1999

Before MURNAGHAN and WILLIAMS, Circuit Judges, and
MOON, United States District Judge for the Western District of
Virginia, sitting by designation.

Affirmed in part, reversed in part and remanded by published opinion. Judge Williams wrote the opinion, in which Judge Murnaghan and Judge Moon joined.

_____

**COUNSEL**

**ARGUED:** Murray Hardison Wright, WRIGHT, ROBINSON, OSTHIMER & TATUM, Richmond, Virginia, for Appellants. Brian Alan Sher, ROSS & HARDIES, Chicago, Illinois, for Appellee. **ON BRIEF:** Jonathan S. Geldzahler, David E. Boelzner, Paul D. Anders, WRIGHT, ROBINSON, OSTHIMER & TATUM, Richmond, Virginia, for Appellants. Daniel P. Hogan, Sean M. Sullivan, ROSS & HARDIES, Chicago, Illinois; John H. O'Brion, Jr., COWAN & OWEN, P.C., Richmond, Virginia, for Appellee.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Signet Bank and Signet Leasing and Financial Corporation (collectively Signet) appeal the district court's grant of summary judgment in favor of Hitachi Credit America Corporation on Hitachi's two breach of contract claims against Signet. Hitachi cross-appeals the district court's dismissal of its fraud claims against Signet, refusal to grant Hitachi attorneys' fees and costs in collateral litigation with third parties, and calculation of pre- and postjudgment interest on Hitachi's monetary award on the breach of contract claims. We agree with the district court that summary judgment was proper on Hitachi's breach of contract claims and that Hitachi was not entitled to attorneys' fees and costs in collateral litigation with third parties. We conclude that the district court erred in dismissing Hitachi's fraud claims and in calculating pre- and postjudgment interest on Hitachi's monetary award. We therefore affirm in part, reverse in part, and remand with instructions to reinstate Hitachi's fraud claims and to recalculate pre- and postjudgment interest on Hitachi's monetary award in a manner consistent with this opinion.

2

I.

A.

This case arises from a fraudulent loan scheme perpetrated by Edward J. Reiners, a former employee of Philip Morris Companies, Inc. In the fall of 1993, Reiners met with representatives of Nelco, Ltd., a computer leasing firm located in Richmond, Virginia, to discuss the acquisition of computer and communications equipment for Philip Morris. Reiners had previously dealt with Nelco on behalf of Philip Morris. At the fall 1993 meeting, Reiners convinced the Nelco representatives that Philip Morris had selected him as Chief Operations Officer for a secret off-shore research and development project titled "Project Star" that needed to lease large quantities of computer equipment from Nelco. Shortly thereafter, Richard Nelson, the president and owner of Nelco, met with representatives of Signet, Nelco's primary lender, to discuss possible funding of "Project Star." As proof of Reiners's authority to represent Philip Morris, Nelson provided Signet with the "Incumbency Certificate" Reiners had given him, which appeared to confirm Reiners's claimed status as Chief Operating Officer of Philip Morris.

Supposedly to protect the secrecy of Project Star, Reiners required Signet to sign a "Confidentiality Agreement." This agreement required Signet to hold all information concerning Project Star in the strictest confidence and to deal exclusively with Reiners as Philip Morris's representative for the project. Reiners explained that the project was so secret that if anyone contacted Philip Morris to inquire about Project Star, Philip Morris would deny that the project existed and would even deny that Reiners was employed by Philip Morris. Signet signed the Confidentiality Agreement on November 12, 1993. Nelco signed the Confidentiality Agreement soon thereafter. On November 18, 1993, Nelco and Reiners (purportedly acting on Philip Morris's behalf) signed a "Master Equipment Lease" (the "Master Lease") setting forth the general terms of an equipment lease arrangement between Nelco, and, ostensibly, Philip Morris.

On November 18, 1993, Reiners and Nelson met with Signet officials. At that meeting, Reiners described Project Star. According to Reiners, Project Star was a confidential off-shore research and devel-

3

opment project being conducted by Philip Morris through a corporate subsidiary known as Worldwide Regional Exports ("WRE"). The purpose of the project was to study the long-term effects of smoking and to develop alternative tobacco products, including "smokeless" cigarettes. Reiners stated that each of Philip Morris's five overseas Project Star research centers would require large amounts of sophisticated computer and communications equipment, including an estimated $25 million worth of equipment in the first year alone. In order to finance the acquisition of the equipment Philip Morris needed pursuant to the Master Lease agreement, Reiners, through Nelco, requested loans from Signet.

In reality, each of Reiners's representations was false and made with fraudulent intent. Project Star was completely fictitious. Reiners was not employed in any capacity by Philip Morris and, according to Philip Morris, had no authority to represent or bind Philip Morris. The Incumbency Certificate and the authenticity signature on it were forgeries. WRE was not affiliated with Philip Morris. Reiners knew that no computers or communications equipment would be procured. Nevertheless, on the basis of Reiners's representations, in November 1993 Signet entered into the first of several secured loans to Nelco for the purchase of computer equipment to be leased pursuant to the Master Lease (the "Credit Facility"). Each loan to Nelco was secured by, inter alia, all of the computer equipment, lease payment streams, and other proceeds associated with the Master Lease (the "Collateral").

The fraud proceeded in the following manner.[1] Nelco was to purchase computers from CCS, Inc., a New York computer reseller and Reiners's co-conspirator in the scheme, and lease the computers to Philip Morris. Pursuant to this plan, Signet Bank (and later, other banks) disbursed funds directly to CCS, which was then supposed to ship the computers to the various project sites for use by Philip Morris. In exchange for the funds, CCS provided the banks with invoices showing that large quantities of equipment had been purchased and shipped to Philip Morris and also provided "Certificates of Acceptance" from Philip Morris. In fact, both the invoices and Certificates of Acceptance were forged and no computers were ever purchased or

_____

[1] These facts are drawn from United States v. Reiners, 934 F. Supp. 721, 722 (E.D. Va. 1996), and the Joint Appendix at 590-91.

4

delivered. Instead, Reiners, with CCS's complicity, diverted the loan proceeds for his personal benefit, including investment of the funds in real estate, stocks, and other securities.

Other banks soon became ensnared in Reiners's fraudulent scheme. Faced with requests for increased funding by Nelco, beginning in 1995 Signet syndicated portions of the loans made under the Credit Facility. Banks that purchased a participation in the Project Star Credit Facility from Signet included NationsBank, N.A., Bank of Montreal, and CoreStates Bank, N.A. In late November 1995, Gil Kennedy, a Vice President in the Syndication Department of Signet Leasing, had a discussion with Brian Riordan, a Vice President of Hitachi.[2] Kennedy told Riordan that Signet was in the process of syndicating participation in a $250 million lease financing for Nelco for the purchase of computers and related equipment involving what Kennedy described as an "A" rated confidential lessee. Kennedy further stated that Signet was interested in selling a portion of its Nelco financing facility to Hitachi, but that he could not disclose the identity of the lessee until Hitachi signed a Confidentiality Agreement.

After some negotiations, on or about December 6, 1995, Hitachi signed a Confidentiality Agreement. Kennedy then informed Riordan that the lessee was Philip Morris and that the transactions between Nelco and Philip Morris were part of a highly secret offshore cigarette development project initiated in 1993. The Confidentiality Agreement prevented Hitachi from investigating the role of Philip Morris in the underlying transaction. Riordan therefore requested a meeting with Signet to obtain more details about the proposed financing transaction.

On December 14, 1995, Riordan and William Besgen, Executive Vice President of Hitachi, attended a meeting in New York with representatives of Signet and Nelco. Present at the meeting were Ken-

_____

[2] The discussion of the negotiations between Hitachi and Signet leading up to Hitachi's approval of the loan assignment relate to Hitachi's fraud claims. Because the fraud claims were dismissed by the district court pursuant to Rule 12(b)(6), we accept as true all of Hitachi's well-pleaded allegations and view the complaint in the light most favorable to Hitachi. See Mylan Lab., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993).

5

nedy, Nelson, and Connie Mooney, a Vice President of Signet Bank. Mooney informed Riordan and Hitachi that (1) Nelco was a "good customer" and that Signet had provided Nelco with $65 million in financing for the Philip Morris leases since the inception of Project Star in 1993; (2) Signet had provided financing to Nelco for a number of other leases with Philip Morris unrelated to the secret project; (3) Philip Morris had given its approval for Hitachi's proposed involvement in the Nelco financing; (4) Signet was confident that Reiners was authorized to act on behalf of Philip Morris; and (5) Signet would obtain and provide to Hitachi an Incumbency Certificate from Philip Morris acknowledging that Reiners was authorized to enter into research project lease transactions on behalf of Philip Morris. Mooney also informed Besgen and Riordan that Philip Morris chose to maintain its secret facilities offshore in order to avoid U.S. government scrutiny and interference. In response to a request from Besgen and Riordan for a copy of a Philip Morris resolution authorizing the research project, Mooney stated that Philip Morris would not provide an authorizing resolution because of the secret nature of the research project. Mooney reasserted that Signet was confident that Philip Morris had properly authorized the lease transactions.

On or about December 18, 1995, Riordan informed Kennedy that Hitachi was interested in being involved in financing lease transactions between Nelco and Philip Morris. Riordan also noted that Hitachi was only interested in financing leases involving "investment grade" lessees, such as Philip Morris, and that Hitachi would not provide financing to Nelco, directly or indirectly, unless Philip Morris was the lessee on the underlying leases. Riordan asked Kennedy and Mooney to confirm again that Philip Morris was the obligor on the underlying leases with Nelco. Mooney again confirmed that Philip Morris was the obligor on those leases, and was directly and primarily liable for all lease payments due under the leases.

During the course of negotiations, Signet informed Hitachi that the underlying lease transactions were in the name of or would involve a purported Philip Morris subsidiary, WRE. Prior to entering any agreement with Signet, Riordan requested a Dun & Bradstreet report on WRE. Dun & Bradstreet was unable to provide a report or any information regarding WRE, prompting Riordan to inform Signet that Hitachi would require a written statement from Philip Morris describ-

6

ing WRE and its purpose as a condition of Hitachi's providing financing for Project Star. In late December 1995, Reiners provided a letter to Nelson on Philip Morris letterhead that described WRE as an entity established by Philip Morris and the U.S. government to implement Project Star (the "Original WRE Letter"). After receiving the Original WRE Letter, Mooney instructed Nelson to obtain a new letter from Reiners deleting any reference to the involvement of the U.S. government in Project Star, because the Original WRE Letter "would raise more questions than it would answer." (J.A. at 43.) Reiners thereafter provided to Nelson a second letter on Philip Morris letterhead (the "Revised WRE Letter"), which was identical to the Original WRE Letter except that it omitted the reference to the U.S. government's involvement in Project Star. Mooney provided the Revised WRE Letter to Hitachi on December 28, 1995. Neither Mooney nor anyone else at Signet gave Hitachi a copy of the Original WRE Letter or otherwise disclosed to Hitachi this alleged government involvement in Project Star.

Unbeknownst to Hitachi, Signet also internally had raised questions regarding Reiners's purported authority to act for Philip Morris. In October 1993, Reiners had submitted an "Authorization Certificate" purportedly executed by Philip Morris Chairman Michael Miles. Signet questioned many aspects of this document. Specifically, Mooney noted that the signature on the Authorization Certificate -- "Mike Miles" -- was significantly different from the signature of "Michael A. Miles" on the Philip Morris annual report. Signet also noted that George R. Lewis, Vice President and Treasurer, rather than Michael Miles, had previously signed loan documents on behalf of Philip Morris. Signet subsequently rejected the Authorization Certificate. Signet did not provide Hitachi with a copy of the Authorization Certificate. Signet also did not disclose to Hitachi that Reiners had submitted the Authorization Certificate in 1993 and that Signet had rejected the certificate.

Hitachi approved the loan transaction on December 21, 1995. During the negotiation of the Assignment Agreement between Hitachi and Signet, Hitachi's outside counsel, James Scantling, informed Signet's attorney, Brian Murphy, that Hitachi required a representation from Signet in the Assignment Agreement that Philip Morris was the lessee. Murphy used a Signet form agreement to prepare the Assign-

7

ment Agreement. On December 28, 1995, Murphy prepared a revised draft of the Assignment Agreement, which incorporated comments received from Scantling and Mooney (the "Revised Draft"). The Revised Draft included a new section, labeled § 2(e), which provided in relevant part:

> To the best knowledge of the Assignor, the Master Equipment Lease Number 1991 dated November 18, 1993 (the "Master Lease") between the Borrower, as "Lessor", and Philip Morris Companies, Inc., a Virginia corporation, as "Lessee" . . . is in full force and effect.

(J.A. at 870.) Section 2(n) of the Assignment Agreement defined "Assignor's knowledge, and any similar reference" as the actual knowledge of certain Signet officers. (J.A. at 872.) Murphy understood the term "best knowledge" in § 2(e) would be defined by § 2(n).

On December 29, 1995, Mooney informed Riordan that Diane McAdams, Philip Morris's assistant secretary, was on vacation and unable to execute the Incumbency Certificate from Philip Morris as required by § 5(g) of the Assignment Agreement. Riordan stated that he did not want to wait to close the loan, and agreed to accept, in lieu of the Incumbency Certificate, a letter from Signet stating that if Signet did not send the Incumbency Certificate to Hitachi by a certain date, then Signet would buy back the transaction from Hitachi. A letter dated December 29, 1995, drafted by Mooney and faxed to Riordan (the "Repurchase Agreement") provided:

> Signet Bank will provide an executed Certificate of Incumbency from Philip Morris Companies, Inc., for the Nelco lease transaction by January 16, 1996. If this document is not delivered to you by that date, we agree to repurchase the transaction from Hitachi in the amount of $12,364,893.80.

(J.A. at 97.)

Following these reassurances from Signet, the loan assignment transaction proceeded forward. On December 29, 1995, Nelco exe-

8

cuted a Promissory Note (the "December Note") in favor of Signet in the original principal amount of $12,305,729.35 and a Security Agreement (the "December Security Agreement") to secure repayment of the December Note. The Security Agreement granted to Signet a security interest in specific collateral including: (1) a master lease dated November 18, 1993 between Nelco, as lessor, and Philip Morris, as lessee (the "Master Lease"), to the extent it applied to lease schedule no. 68; (2) lease payments payable to Nelco by Philip Morris under the Master Lease and lease schedule no. 68; (3) the equipment described in lease schedule no. 68; and (4) all proceeds of the foregoing. On the same day, Hitachi entered into the Assignment Agreement with Signet (the "December Assignment Agreement"). The December Assignment Agreement provided that Signet agreed to sell and Hitachi agreed to buy all of Signet's "rights, obligations, title and interest" in the December Note, the December Security Agreement, and the collateral described therein. (J.A. at 81.) Hitachi paid Signet the sum of $12,364,893.80 as the purchase price under the December Assignment Agreement.

On January 5, 1996, Signet delivered to Hitachi a document that was represented as an Incumbency Certificate executed by Philip Morris. After receiving the certificate, Riordan sent the executed December Assignment Agreement to Signet on January 11, 1996. On January 31, 1996, Nelco executed a second Promissory Note (the "January Note") in favor of Signet in the original principal amount of $12,272,655.26 and a second Security Agreement (the "January Security Agreement") to secure repayment of the January Note. Hitachi entered into a second Assignment Agreement with Signet on January 31, 1996 (the "January Assignment Agreement") for a purchase price of $12,325,461.95. The terms of the January Assignment Agreement were identical to the terms of the December Assignment Agreement.

On March 19, 1996, Signet informed Hitachi that Reiners was not an employee or officer of Philip Morris and was not authorized to act on Philip Morris's behalf, that the signature on the Incumbency Certificate was a forgery, and that Philip Morris denied that it was a party to the Master Lease or other lease agreements described in the documents between Nelco, Signet, and Hitachi. On March 26, 1996, Hitachi notified Signet that Signet had failed to comply with the terms

9

of the Repurchase Agreement, because it had failed to provide an Incumbency Certificate from Philip Morris. Pursuant to the terms of the Repurchase Agreement, Hitachi demanded that Signet repurchase Hitachi's interest in the December Note, the December Security Agreement, and the Collateral described in the December Security Agreement. By letter dated March 29, 1996, Signet informed Hitachi that Signet would not repurchase Hitachi's interest in the subject loans and loan documents.

B.

On May 24, 1996, Hitachi brought this diversity action in United States District Court for the Eastern District of Virginia against Signet Bank alleging, inter alia, actual and constructive fraud, breach of the Repurchase Agreement, and breach of § 2(e) of the Assignment Agreements.**3** Concurrent with its action against Signet, Hitachi participated in collateral litigation resulting from the fraud perpetuated by Reiners. Between March 1996 and June 1997, Hitachi and its attorneys participated in a bankruptcy proceeding involving Nelco, with the purpose of pursuing possible recovery of the amounts due on the Hitachi loans. Between September 1996 and February 1997, Hitachi, Signet, and the other Project Star lenders negotiated a series of agreements with the U.S. government relating to the allocation among the lenders of funds seized by the government following the discovery of the fraud.**4**

The district court dismissed various counts of Hitachi's Complaint and Amended Complaint against Signet in its decisions of December 3, 1996 and May 12, 1997. On cross motions for summary judgment on the two remaining claims, breach of the Repurchase Agreement and breach of § 2(e) of the Assignment Agreements, the district court granted Hitachi's motion for summary judgment on July 21, 1997. In

_____

**3** In its Amended Complaint, Hitachi added Signet Leasing and Financial Corporation as a defendant.

**4** On or about June 5, 1996, Reiners pleaded guilty to bank fraud in violation of 18 U.S.C.A. § 1344 (West Supp. 1998) and to money laundering in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i) (West Supp. 1998). Reiners also agreed to an order of forfeiture of the proceeds of his fraudulent scheme.

the July 21 Order, the district court directed Hitachi to file a brief on the subject of damages. On November 14, 1997, the district court issued a final order awarding Hitachi attorneys' fees and costs for its litigation, but denying recovery of these fees and costs related to the criminal forfeiture proceeding and the Nelco bankruptcy. The district court also awarded Hitachi prejudgment interest on the balance of the loans at the rates set in the Assignment Agreements and postjudgment interest on the balance of the loans at the statutory rate of nine percent. Signet appeals the district court's granting of Hitachi's motion for summary judgment. Hitachi cross-appeals the district court's dismissal of Hitachi's fraud claims, its partial denial of costs and fees, and its calculation of the appropriate pre- and postjudgment interest.

II.

We turn first to Signet's appeal from the district court's grant of summary judgment in Hitachi's favor on Hitachi's breach of contract claims. This Court reviews a grant of summary judgment de novo. See Higgins v. E.I. DuPont de Nemours & Co., 863 F.2d 1162, 1167 (4th Cir. 1988). Summary judgment is appropriate only if there are no material facts in dispute and the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). As a federal court sitting in diversity, we must apply the choice of law rules of the forum state -- in this case, Virginia. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941). Virginia law looks favorably upon choice of law clauses in a contract, giving them full effect except in unusual circumstances. See Tate v. Hain, 25 S.E.2d 321, 324 (Va. 1943). Section 9(c) of the Assignment Agreements explicitly calls for the application of Virginia law in the interpretation of "[t]his Agreement and the rights and obligations of the parties hereunder . . . including all matters of construction, validity and performance." (J.A. at 91.) We therefore apply Virginia law in our review of Hitachi's breach of contract claims.

A.

Signet first argues on appeal that the district court erred in granting Hitachi's motion for summary judgment on Hitachi's claim that Signet breached § 2(e) of the Assignment Agreements when it turned out

11

that Philip Morris was not a party to the underlying lease transaction and the Master Lease between Nelco and Philip Morris was not in full force and effect. Under Virginia law, courts adhere to the "plain meaning" rule in interpreting and enforcing a contract. "`[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself. . . . This is so because the writing is the repository of the final agreement of the parties.'" Berry v. Klinger, 300 S.E.2d 792, 796 (Va. 1983) (quoting Globe Co. v. Bank of Boston, 140 S.E.2d 629, 633 (Va. 1965)) (alteration and omission in original). In interpreting a contract, a court should read the contract as a single document and give meaning to every clause where possible. See Berry, 300 S.E.2d at 796. Such an interpretation gives effect to the "presumption that the parties have not used words aimlessly." Winn v. Aleda Constr. Co., 315 S.E.2d 193, 195 (Va. 1984).

With these principles in mind, we turn to the language of the Assignment Agreements. Section 2 of the Assignment Agreements states, in relevant part, that:

> In order to induce the Assignee [Hitachi] to enter into this Agreement and purchase the Loan Documents, the Assignor [Signet] makes the following representations and warranties:
>
> . . .
>
> (e) To the best knowledge of the Assignor, the Master Equipment Lease Number 1991 dated November 18, 1993 (the "Master Lease") between the Borrower, as "Lessor", and Philip Morris Companies, Inc., a Virginia corporation, as "Lessee" (the "Lessee"), as supplemented by Supplementary Schedule No. 68 (the "Supplementary Schedule") dated November 16, 1995 (the Master Lease and Supplementary Schedule being herein collectively referred to as the "Lease") is in full force and effect on the date hereof, the Lessee has not prepaid any installment of rent due under the Lease, the Lease has not been amended and neither the Borrower nor the Lessee is in default under the Lease.

(J.A. at 82-83.) Hitachi argues that § 2(e) is a warranty that Philip Morris was a party to the underlying lease transaction and the Master

12

Lease between Nelco and Philip Morris was in full force and effect. To recover for breach of warranty under Virginia law, Hitachi has the burden of showing (1) the existence of a warranty and (2) a breach. See Collier v. Rice, 356 S.E.2d 845, 847 (Va. 1987). It is undisputed that Philip Morris was not a party to the underlying lease transaction and the Master Lease between Nelco and Philip Morris was not in full force and effect. The determinative issue therefore is whether Signet represented and warranted in § 2(e) that Philip Morris was a party to the underlying lease transaction and the Master Lease between Nelco and Philip Morris was in full force and effect.

Whether § 2(e) is a warranty and representation turns on the meaning of the clause "To the best knowledge of the Assignor." Under Virginia law, courts should not resort to extrinsic evidence to interpret a contract where the contract language is plain and unambiguous. See Berry, 300 S.E.2d at 796. We therefore turn first to the language of the Assignment Agreements to see if it expressly defines this clause. Section 2(n) of the Assignment Agreements defines "Assignor's Knowledge" in the following manner:

> For the purposes of this Section 2, any reference to "Assignor's knowledge", and any similar reference, shall mean the actual knowledge of the President or any Vice President of the Assignor or any other officer of the Assignor having responsibility for the administration of the Note that is the subject of the representation or warranty to which such reference relates.

(J.A. at 85 (emphasis added).)

The only references to "Assignor's knowledge" and similar references in § 2 are "best knowledge of the Assignor" in § 2(b) and § 2(e), and "Assignor's knowledge" in § 2(k). Because a court should read a contract as a whole and give meaning to every clause if possible, see Berry, 300 S.E.2d at 796, we must import the definition in § 2(n) into § 2(e) if the clause "any similar reference" in § 2(n) is to have any meaning. Signet argues that any interpretation of § 2(e) must take into account the qualifier "to the best" and that the "any similar reference" of § 2(n) refers only to "knowledge of the Assignor" and not "best knowledge of the Assignor." Thus, Signet argues that the substi-

13

tution of the definition in § 2(n) transforms § 2(e) into a warranty and representation that to the best actual knowledge of the specified Signet officials, the lease is in full force and effect. In contrast, Hitachi argues that "any similar reference" refers to the clause "best knowledge of the Assignor," transforming § 2(e) into a warranty and representation that the specified Signet officials have actual knowledge that the lease is in full force and effect.

We agree with the district court that a plain reading of the Assignment Agreements mandates Hitachi's interpretation. Absent any reference in the Assignment Agreements as to what the clause "to the best" means, we believe that the most straightforward interpretation of "any similar reference" in § 2(n) is that it refers to "best knowledge of the Assignor" in § 2(e). Because we agree that the interpretation of § 2(e) is plain and unambiguous, we need not consider Signet's parol evidence of merger & acquisition and banking treatises. See Berry, 300 S.E.2d at 796. Although the language of § 2(e) could have been drafted in a more direct, declaratory manner like the other warranties in § 2, "[h]owever inartfully it may have been drawn, the court cannot make a new contract for the parties, but must construe its language as written." Berry, 300 S.E.2d at 796. The district court, therefore, correctly held that Signet warranted in § 2(e) that the underlying lease transaction was in full force and effect and that Philip Morris was a party to the Master Lease.

Signet also argues that (1) a finding of warranty in § 2(e) is inconsistent with the disclaimer in § 2(m) and the shifting of the loan risk to Hitachi in § 3; (2) it is only liable for breach of § 2(e) upon proof that one of the specified officers had actual knowledge of fraud; and (3) the Philip Morris reference in § 2(e) merely identifies the lease being discussed and sorts out the function of the parties to the transaction. We find all of these arguments to be unpersuasive. First, § 2(m) disclaims liability for warranties and representations, "except as set forth in this section 2." (J.A. at 84.) It, therefore, by its terms, does not apply to § 2(e). Section 3 shifts the risk of the transaction to Hitachi, but only regarding the financial condition of the parties involved in the lease. This section does not shift the risk to Hitachi regarding whether the underlying lease transaction is actually in effect and whether Philip Morris is a party to the Master Lease.

14

Signet's second and third arguments run afoul of the plain language of § 2(e). Signet's desired interpretation of § 2(e) -- that is it is only breached if Signet's President or a Vice President knew that the underlying lease was not in full force and effect or that Philip Morris was not a party to the lease -- is a tortured reading of the section. Had Signet wanted that interpretation, it could have drafted that section to begin, "The Assignor is without knowledge." Finally, we believe that the reference to Philip Morris, which included its full corporate name and state of incorporation, unequivocally warranted that the lease between the borrower and Philip Morris was in full force and effect. Signet's argument that the reference to "Philip Morris" in § 2(e) merely identified the lease being discussed and sorted out the function of the parties on each transaction is not plausible in light of the fact that the lease is already identified by its execution date and document number.

We conclude that § 2(e), when read in conjunction with the definition in § 2(n), demonstrates that Signet warranted that it possessed actual knowledge that the underlying lease transaction was in full force and effect and that Philip Morris was a party to the Master Lease. Signet breached that warranty because the underlying lease transaction was not in full force and effect and Philip Morris was not a party to the Master Lease. The district court correctly granted Hitachi's motion for summary judgment on its claim for breach of § 2(e) of the Assignment Agreements.

B.

Signet next argues on appeal that the district court erred in granting summary judgment to Hitachi on Hitachi's claim that Signet breached the Repurchase Agreement when Signet delivered to Hitachi an Incumbency Certificate that turned out to be forged. Signet's argument takes two forms. First, Signet argues that the Repurchase Agreement is not a separate contract, but is subsumed within the terms of the December Assignment Agreement. In the alternative, Signet argues that even if the Repurchase Agreement is deemed to be a contract, § 2(m) of the December Assignment Agreement effectively disclaims the validity of the Incumbency Certificate. We address these arguments in turn.

15

Signet first argues that the Repurchase Agreement is not a contract independent of the December Assignment Agreement, and therefore, the Incumbency Certificate is subject to the disclaimer of validity of loan-related documents in § 2(m). Because the Repurchase Agreement and Assignment Agreement are separate instruments, we are confronted with the issue of whether to read them together as one contract. "A contract may be contained in several instruments," and they may be read together as one instrument "[i]f made at the same time and in relation to the same subject matter." D.H. Pritchard, Contractor, Inc. v. Nelson, 147 F.2d 939, 942 (4th Cir. 1945); accord Bott v. N. Snellenburg & Co., 14 S.E.2d 372, 374 (Va. 1941); see also Daugherty v. Diment, 385 S.E.2d 572, 574 (Va. 1989) ("Where a business transaction is based upon more than one document executed by the parties, the documents will be construed together to determine the intent of the parties; each document will be employed to ascertain the meaning intended to be expressed by the others."). To construe two instruments as one, reference in one instrument to the other need not be explicit; "it is sufficient if it is fairly traceable." Texas Co. v. Northup, 153 S.E. 659, 662 (Va. 1930). Until it appears that the several writings are part of a single transaction, either from the writings themselves or by extrinsic evidence, courts should not read the writings together as one contract because the same parties may have had more than one transaction in one day of the same general nature. See Bailey v. Hannibal & St. Joseph R.R. Co., 84 U.S. 96, 108 (1873).

Hitachi concedes that the execution of the December Assignment Agreement depended upon Signet's execution of the Repurchase Agreement. Moreover, it is undisputed that the December Assignment Agreement and the Repurchase Agreement bore the same date (December 29, 1995) and concerned the same subject matter (the assignment of the loan from Signet to Hitachi). As the case law indicates, however, a court is not required to construe two documents as one contract just because they are executed at the same time and concern the same subject matter. The court must give effect to the intent of the parties. See American Realty Trust v. Chase Manhattan Bank, N.A., 281 S.E.2d 825, 831 (Va. 1981). The parties dispute their intent in executing the Repurchase Agreement. Signet argues that the sole purpose of the Repurchase Agreement was to extend the time within which Signet was required to provide the Incumbency Certificate promised in § 5(g) of the December Assignment Agreement. Hitachi argues that the Repur-

16

chase Agreement warranted that Signet would deliver an Incumbency Certificate from Philip Morris, and that it was a necessary guarantee because the certificate would be delivered after Hitachi had performed its obligations under the December Assignment Agreement and released the funds.

We agree with the district court that the key to the intent of the parties lies in the plain language of the Repurchase Agreement. See Berry, 300 S.E.2d at 796. The Repurchase Agreement expressly states that "Signet Bank will provide an executed Certificate of Incumbency from Philip Morris." (J.A. at 97.) We believe that this language indicates that the Repurchase Agreement dealt with a distinct buyback transaction, and thus, constituted an agreement separate from the December Assignment Agreement. Although general rules of construction should not be applied mechanically to thwart the intent of the contracting parties, American Realty Trust, 281 S.E.2d at 831, we agree that there is ample evidence to support this conclusion. As the district court noted, the Repurchase Agreement did not refer to the December Assignment Agreement or, more specifically, to § 5(g) of that agreement. Moreover, reading the December Assignment Agreement and Repurchase Agreement together as one document would lead to the absurd result that the latter, which the parties executed in order for the transaction to go forward, is subject to the disclaimer of § 2(m) in the former. See id. (holding as unreasonable the view that the parties intended that one section of an instrument executed by the parties would render meaningless another instrument executed by the parties). We conclude that the Repurchase Agreement is a separate agreement that warranted that Signet would provide an Incumbency Certificate from Philip Morris.

On appeal, Signet also argues that the Repurchase Agreement is not a separate and independent contract that modifies the December Assignment Agreement because it referenced the "Nelco lease transaction" in the December Assignment Agreement, and it was a unilateral promise not supported by consideration. We find these arguments unpersuasive. First, Virginia law does not favor declaring contracts void for indefiniteness, and courts will not "permit parties to be released from the obligations which they have assumed if this can be ascertained with reasonable certainty from language used, in the light of all the surrounding circumstances." High Knob, Inc. v. Allen, 138

17

S.E.2d 49, 53 (Va. 1964). We believe that the term "Nelco lease transaction," when construed in light of the surrounding circumstances, including the negotiations between Signet and Hitachi and the December Assignment Agreement, is sufficiently complete and definite for the Repurchase Agreement to be valid and enforceable. Second, it is clear to us that the Repurchase Agreement was supported by consideration. The Repurchase Agreement was a bargained-for exchange in which Signet agreed to provide an Incumbency Certificate from Philip Morris, and in return, Hitachi agreed to release the funds it promised under the December Assignment Agreement before reviewing the certificate. Because the Repurchase Agreement is a separate contract, it is not subject to the requirement in § 9(d) of the December Assignment Agreement that an amendment be executed by both parties.[5]

In the alternative, Signet argues that even assuming that the Repurchase Agreement is a separate contract, it constitutes a limited modification to the December Assignment Agreement that simply extends the time in which Signet had to deliver the Incumbency Certificate. Because the Repurchase Agreement is a limited modification, the argument continues, the Incumbency Certificate is still subject to the disclaimer of validity of loan-related documents in § 2(m). We do not find this argument compelling. We agree with the district court that the Repurchase Agreement is more than a limited modification; it plainly and unambiguously promises an Incumbency Certificate from Philip Morris. Moreover, we agree with the district court that reading the December Assignment Agreement and Repurchase Agreement as two separate contracts removes "Signet's contention that the disclaimers in Assignment Agreement § 2(m) apply to the Repurchase Agreement." (J.A. at 171.) There is no similar disclaimer in the Repurchase Agreement, and we will not read one into it. See Bridgestone/Firestone, Inc.

_____

[5] Section 9(d) of the Assignment Agreements provides:

> Entire Agreement. This agreement constitutes the entire agreement between the parties with respect to the subject matter hereof and thereof and shall not be amended or altered in any manner except by a document in writing executed by both parties.

(J.A. at 91.)

18

v. Prince William Square Assocs., 463 S.E.2d 661, 664 (Va. 1995) ("The law will not insert by construction, for the benefit of a party, an exception or condition which the parties omitted from their contract by design or neglect.").

We conclude that the Repurchase Agreement was an agreement separate from the December Assignment Agreement that Signet breached when it delivered to Hitachi an incumbency certificate that was not executed by Philip Morris. The district court properly granted Hitachi's motion for summary judgment on this claim.

III.

We next turn to Hitachi's cross-appeal.[6] On cross-appeal, Hitachi first argues that the district court improperly dismissed its claims for fraud against Signet pursuant to Rule 12(b)(6). At the outset, we note that "Virginia law recognizes the separate tort of fraud, even where the parties have agreed to a contract," City of Richmond v. Madison Management Group, Inc., 918 F.2d 438, 446-47 (4th Cir. 1990), and a plaintiff may recover damages for both fraud and breach of contract, see id. at 457. We review a district court's dismissal of a claim under Rule 12(b)(6) de novo. See Mylan Lab., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). Generally, where a cause of action arises in tort, Virginia applies the law of the state where the tortious conduct or injury occurred. See Jones v. R.S. Jones & Assocs., 431 S.E.2d 33, 34 (Va. 1993) (stating that lex loci delicti is settled rule in Virginia). Where a choice of law clause in the contract is sufficiently broad to encompass contract-related tort claims such as fraudulent inducement, other courts have honored the intent of the parties to choose the applicable law. See In re Allegheny Int'l, Inc., 954 F.2d 167, 178 (3d Cir. 1992); Moses v. Business Card Express, Inc., 929 F.2d 1131, 1139 (6th Cir. 1991). We believe that the choice of law language of § 9(c) in the Assignment Agreements indicates that the parties intended to cover more than merely contract claims. Thus, pursuant to § 9(c) and

_____

[6] We address only the issues Hitachi briefed on its cross-appeal. See Canady v. Crestar Mortgage Corp., 109 F.3d 969, 973-74 (4th Cir. 1997) (holding that issues raised in notice of appeal but not briefed on appeal are deemed waived).

19

recognizing the close relationship of the tort claims to the contract, this Court will apply Virginia law to Hitachi's fraud claims.

Hitachi alleges in its Amended Complaint that the representations and material omissions that Signet made to Hitachi during the course of the loan transaction negotiations constituted fraudulent inducement to enter the Assignment Agreements. To prevail on an actual fraud claim under Virginia law, a plaintiff must prove by clear and convincing evidence "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead, and (6) resulting damage to the party misled." Evaluation Research Corp. v. Alequin, 439 S.E.2d 387, 390 (Va. 1994). Virginia law also recognizes an action for fraud where misrepresentations are made without specific fraudulent intent but made with reckless abandon and disregard for the truth. See Bradley v. Tolson, 85 S.E. 466, 467 (Va. 1915). Constructive fraud differs only in that the misrepresentation of material fact is not made with the intent to mislead, but is made innocently or negligently; the plaintiff must still prove the other elements of actual fraud -- reliance and detriment -- by clear and convincing evidence. See Evaluation Research Corp., 439 S.E.2d at 390.

Under Virginia law, a concealment or omission of a material fact may also give rise to a claim of actual fraud. Although silence does not constitute fraud in the absence of a duty to disclose, cf. Norris v. Mitchell, 495 S.E.2d 809, 812-13 (Va. 1998), "[c]oncealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud," Allen Realty Corp. v. Holbert, 318 S.E.2d 592, 597 (Va. 1984). For purposes of an action for fraud, concealment, whether by word or conduct, may be the equivalent of a false representation because it always involves deliberate nondisclosure designed to prevent another from learning the truth. See Van Deusen v. Snead , 441 S.E.2d 207, 209 (Va. 1994). Moreover, a party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud. Id.

It is not enough for a plaintiff in a fraud action to show that it acted to its detriment in response to the defendant's false representation or concealment of a material fact. "In order to prove reliance, a plaintiff

20

must demonstrate that its reliance upon the representation was reasonable and justified." <u>Meridian Title Ins. Co. v. Lilly Homes, Inc.</u>, 735 F. Supp. 182, 185 (E.D. Va. 1990) (interpreting Virginia law), <u>aff'd</u>, 934 F.2d 319 (4th Cir. 1991). The touchstone of reasonableness is prudent investigation. A plaintiff cannot claim that its reliance was reasonable and justified when it makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry. <u>See Harris v. Dunham</u>, 127 S.E.2d 65, 71-72 (Va. 1962). Moreover,

> [I]f false representations are made regarding matters of fact, and the means of knowledge are at hand and equally available to both parties, and the party, instead of resorting to them, sees fit to trust himself in the hands of one whose interest it is to mislead him, the law, in general, will leave him where he has been placed by his own imprudent confidence.

<u>Horner v. Ahern</u>, 153 S.E.2d 216, 219 (Va. 1967) (quoting <u>Costello v. Larsen</u>, 29 S.E.2d 856, 858 (Va. 1944)). The cases in Virginia are clear, however, that "one cannot, by fraud and deceit, induce another to enter into a contract to his disadvantage, then escape liability by saying that the party to whom the misrepresentation was made was negligent in failing to learn the truth." <u>Nationwide Ins. Co. v. Patterson</u>, 331 S.E.2d 490, 492 (Va. 1985). A buyer may therefore recover for fraud if the seller does or says anything to divert the buyer "from making the inquiries and examination which a prudent man ought to make." <u>Horner</u>, 153 S.E.2d at 219.

In its Amended Complaint, which incorporated by reference the original fraud allegations in its Complaint, Hitachi alleges that it reasonably relied to its detriment on the untrue statements that Signet made to Hitachi regarding the purported transactions between Nelco and Philip Morris. In the Amended Complaint, Hitachi also alleges that Signet made representations to Hitachi regarding the purpose and nature of Project Star and the purported authority of Reiners to act on behalf of Philip Morris with knowledge of their falsity, or reckless indifference to their truth or falsity. Hitachi also alleges that Signet deliberately concealed and omitted material facts regarding the purported involvement of the U.S. government in Project Star and Sig-

21

net's doubts as to Reiners's authority to act on behalf of Philip Morris. Hitachi also claims that Signet intended for Hitachi to rely on these representations and omissions. Finally, Hitachi alleges in the Amended Complaint that it relied on these representations and omissions and thereby was induced to enter the Assignment Agreements to its detriment.

The only element of Hitachi's fraud causes of action that Signet questions is whether Hitachi's reliance on Signet's allegedly false representations and omissions of material fact was reasonable and justified. Signet argues that §§ 2(m) and 3 of the Assignment Agreements allocate to Hitachi the responsibility of learning about the underlying transaction and disclaim Hitachi's reliance on any information provided by Signet. In general, a contractual disclaimer of reliance is not a prophylactic against a claim of fraud. "While . . . contracting parties may waive their contractual rights and disclaim or limit certain liabilities, a `false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract by a court of equity'" or an action for damages in a court of law. George Robberecht Seafood, Inc. v. Maitland Bros. Co., 255 S.E.2d 682, 683 (Va. 1979) (quoting Wilson v. Carpenter, 21 S.E. 243, 244 (Va. 1895)). Thus, a buyer can show that a contract of sale was induced by the seller's fraud, even though the written contract contains covenants waiving warranties or disclaiming or limiting liabilities. See id.

We have previously held, however, that under Virginia law reliance on a false representation is not justified where the relying party fails to undertake a prudent investigation and specifically disclaims reliance on that very representation in a contract. In Hoover Universal, Inc. v. Brockway Imco, Inc., 809 F.2d 1039 (4th Cir. 1987), a buyer purchased a machine after reviewing documentation describing the machine that, unbeknownst to seller and buyer, was erroneous. See id. at 1041-42. The buyer brought an action for fraudulent inducement against the seller, arguing that the erroneous description was a "substantial motivating factor" in purchasing the machine. Id. at 1043. Not only did the buyer fail to inspect the machine closely, the sales contract the buyer signed provided that the buyer would "inspect" and "become familiar" with the machine. Id. at 1041, 1044. We affirmed the district court's grant of summary judgment in favor of the seller

22

on the ground that the buyer's "clear failure to fulfill the duty of inspection imposed by both the operation of law and contract" precluded its effort to assert reliance on the handout. Id. at 1044. Based on Hoover and cases from our sister circuits that reached the same conclusion in similar factual situations,[7] the district court concluded that Hitachi expressly warranted and represented that it would conduct its own investigation of the underlying lease, and Signet expressly disclaimed any statements by the Borrower or the authenticity of any of the documents related to the loan.

We conclude that the district court erred. Hitachi was reasonable and justified in relying on Signet's representations and omissions regarding the purpose and nature of Project Star and the purported authority of Reiners to act on behalf of Philip Morris. First, Hitachi conducted a prudent investigation under the circumstances. The Confidentiality Agreement Hitachi signed at the start of the negotiations with Signet prevented a full investigation into the truth of Signet's representations.[8] Moreover, Signet's concealment of the purported involvement of the U.S. government in Project Star prevented Hitachi from making inquiries that might have led to the truth. In spite of these impediments, Hitachi attempted to investigate the underlying transaction, as evidenced by its request to Signet for an authorizing resolution from Philip Morris and its request to Dun & Bradstreet for a report on WRE. Hitachi was simply unable to discover the fraud by gathering information from sources other than Signet. Under these circumstances, as alleged, Hitachi conducted a prudent investigation and was justified in relying on Signet's representations.

_____

[7] See Banque Arabe et Internationale v. Maryland Nat'l Bank, 57 F.3d 146, 156 (2d Cir. 1995); Bank of the West v. Valley Nat'l Bank, 41 F.3d 471, 477-78 (9th Cir. 1994); First Fin. Fed. Sav. & Loan Ass'n v. E.F. Hutton Mortgage Corp., 834 F.2d 685, 687-88 (8th Cir. 1987).

[8] The Confidentiality Agreement specifically stated that Hitachi was entitled to rely on the representation that Reiners was an authorized Philip Morris representative. The Confidentiality Agreement also prevented Hitachi from contacting Philip Morris to discuss Project Star. Moreover, Reiners represented that if anyone contacted Philip Morris to inquire about Project Star, Philip Morris would deny that Reiners was a Philip Morris employee.

23

Second, unlike the buyer in Hoover, Hitachi did not contractually disclaim reliance on the representations claimed to be fraudulent. Reading Hoover in conjunction with George Robberecht, we conclude that a buyer can recover for fraudulent inducement not only where the contract contains a general disclaimer of warranties and liabilities, but also where the contract contains specific disclaimers that do not cover the allegedly fraudulent contract-inducing representations. Sections 2(m) and 3(e)-(i) of the Assignment Agreements contain disclaimers by Signet and warranties by Hitachi regarding only the financial condition or statements of Nelco and Philip Morris and the financial risks of the transaction. By their plain terms, the disclaimers of liability do not extend Hitachi's obligations to include ascertaining the validity of the underlying transaction and are insufficiently specific to render Signet immune from the alleged fraud that induced the contract.

We conclude that Hitachi has affirmatively alleged all of the elements of constructive and actual fraud on the part of Signet and that Hitachi did not disclaim reliance on Signet's alleged fraudulent misrepresentations and omissions of material fact that induced Hitachi to enter the Assignment Agreements.**9** Because

_____

**9** We do not believe that the Supreme Court of Virginia's recent decision in Richmond Metropolitan Auth. v. McDevitt Street Bovis, Inc. 1998 WL 774505 (Va. Nov. 6, 1998), changes our analysis. In that case, the Supreme Court of Virginia held that a breach of a contractual duty does not give rise to a claim for constructive or actual fraud. See Richmond Metropolitan Auth., 1998 WL 774505 at *3. The Supreme Court of Virginia concluded, however, that its decision did not apply to cases of fraud in the inducement. See id. at *4 ("The present case is not one of fraud in the inducement."). This conclusion is consistent with the distinction in Virginia law between a statement that is false when made (which is fraud) and a promise that becomes false only when the promisor later fails to keep his word (which is breach of contract). See Colonial Ford Truck Sales, Inc. v. Schneider, 325 S.E.2d 91, 94 (Va. 1985). In this case, Hitachi's fraud claims do not rest on a breach of the duties that Signet undertook in the Assignment Agreements; rather, they concern alleged misrepresentations and omissions of material fact that Signet made in order to induce Hitachi to sign the Assignment Agreements. Under Virginia law, Hitachi has stated claims for constructive and actual fraud.

24

Hitachi can prove a set of facts that, if believed, would support its fraud claims and would entitle it to relief, the district court erred in dismissing these claims. See Mylan Lab., 7 F.3d 1130, 1134 (4th Cir. 1993). We therefore reverse the district court's dismissal of Hitachi's fraud claims and remand to the district court with instructions to reinstate these claims.

IV.

Hitachi next argues on cross-appeal that it was entitled to attorneys' fees and costs it incurred in collateral litigation involving the Nelco bankruptcy and the criminal forfeiture proceeding. The district court refused to award Hitachi attorneys' fees and costs for these two proceedings, concluding that there was no cause and effect relationship between Signet's breach of § 2(e) and each proceeding. This Court reviews a district court's decision to award attorneys' fees for abuse of discretion. See Carroll v. Wolpoff & Abramson, 53 F.3d 626, 628 (4th Cir. 1995). We apply Virginia law to determine whether an award of attorneys' fees and costs to Hitachi is warranted. See Culbertson v. McCall Coal Co., 495 F.2d 1403, 1405-06 (4th Cir. 1974).

In general, absent a contractual or statutory provision to the contrary, a prevailing party cannot recover attorneys' fees and expenses from a losing party. See Mullins v. Richland Nat'l Bank, 403 S.E.2d 334, 335 (Va. 1991). Where a defendant's "breach of contract has forced the plaintiff to maintain or defend a suit with a third person," however, Virginia law provides that the plaintiff may recover the counsel fees and court costs incurred by him in that suit, provided those expenditures "are reasonable in amount and reasonably incurred." Hiss v. Friedberg, 112 S.E.2d 871, 876 (Va. 1960) (the "Hiss rule"). The employment of counsel must be a "direct and necessary consequence" of the defendant's breach of contract. Id. at 876-77. If the damages that result from defendant's breach are consequential rather than direct, they are not compensable. See Long v. Abbruzzetti, 487 S.E.2d 217, 219-20 (Va. 1997). Parties may also allocate attorneys' fees and costs via an indemnity clause in a contract. See Chesapeake & Potomac Telephone Co. v. Sisson & Ryan, Inc., 362 S.E.2d 723, 728-29 (Va. 1987).

25

Hitachi argues that it is entitled to recover attorneys' fees and costs pursuant to § 8(a) of the Assignment Agreement.[10] Hitachi also argues that it is entitled to recover attorneys' fees and costs pursuant to the Hiss rule. The issue we must resolve, therefore, is whether Hitachi's expenses arose out of or were related to Signet's breach of the Assignment Agreements or the Repurchase Agreement so as to implicate § 8(a) or whether the expenses were a direct and necessary consequence of Signet's breach so as to implicate Virginia common law. We address the Nelco bankruptcy and the criminal forfeiture proceeding in turn.

The direct cause of the Nelco bankruptcy was Nelco's fragile financial condition, for which Hitachi explicitly assumed responsibility in §§ 3(e) and (h) of the Assignment Agreements. We agree with the district court that Hitachi had access to all relevant financial information but failed to investigate adequately Nelco's financial strength. Signet's breach of § 2(e) and of the Repurchase Agreement caused Hitachi's expenditures in the Nelco bankruptcy proceeding only in the sense that Hitachi might not have entered the transaction in the first place but for the breach. The district court did not abuse its discretion in concluding that Hitachi's attorneys' fees and costs did not "arise out of" or "result from" Signet's breach.[11] Hitachi's expenditures also were not a direct and necessary consequence of Signet's breach.

_____

**10** Section 8(a) of the Assignment Agreements provides in relevant part:

> Indemnity. Each party hereto shall upon the other party's demand pay and assume liability for, and indemnify, protect, defend, save and keep harmless such other party, on an after tax basis, from any and against any and all liabilities, obligations, losses, damages, settlements, claims, actions, suits, penalties, costs and expenses (including, without limitation, reasonable fees and expenses of counsel) of whatsoever kind and nature which shall at any time or from time to time be imposed upon, incurred by or asserted against such other party in any way relating directly or indirectly to, or arising out of, (i) any inaccuracy or other breach of any representation or warranty made by a party under this Agreement or in any other document, instrument or certificate delivered by it pursuant to this Agreement.

(J.A. at 90.)

**11** Although the district court only addressed Signet's breach of § 2(e), we believe that its reasoning applies to Signet's breach of the Repurchase Agreement as well.

26

The direct cause of the criminal forfeiture proceeding was Reiners's fraud. Although we disagree with the district court's reasoning that Hitachi assumed the risk of Reiners's fraud, we agree with the district court's ultimate conclusion. We believe, as stated above, that Signet's breach of § 2(e) and of the Repurchase Agreement caused Hitachi's expenditures in the criminal forfeiture proceeding only in the sense that Hitachi might not have entered the transaction in the first place but for the breach. The district court did not abuse its discretion in holding that Hitachi's attorneys' fees and costs were not caused by Signet's breach. Hitachi's expenses also did not "arise out of" or "relate to" Signet's breach.

Accordingly, we conclude that the district court did not abuse its discretion when it denied Hitachi attorneys' fees and costs in connection with the criminal forfeiture proceeding and Nelco bankruptcy. We therefore affirm the district court on the issue of attorneys' fees and costs.

V.

Finally, Hitachi argues on cross-appeal that the district court miscalculated the pre- and postjudgment interest due on its monetary award.**12** The district court awarded Hitachi prejudgment interest at the rates set in the Assignment Agreements -- 6.55% on the balance of the December loan and 6.35% on the balance of the January loan. The district court awarded Hitachi postjudgment interest of nine percent on the balance of the combined loans in accordance with the Virginia Code. These rulings are matters of law that this Court reviews de novo. See In re Pucci Shoes, Inc., 120 F.3d 38, 41 (4th Cir. 1997).

A.

Virginia law governs the award of prejudgment interest in a diversity case. See United States v. Dollar Rent A Car Systems, Inc., 712

_____

**12** In its November 17, 1997 Order, the district court awarded Hitachi the net outstanding balance of its loan in the amount of $6,340,340.00, attorneys' fees and costs for the Hitachi Litigation (this case) in the amount of $608,950.26, and attorneys' fees and costs in the amount of $32,280.19 for the Signet Declaratory Judgment Action.

27

F.2d 938, 940 (4th Cir. 1983). With regard to such an award, the Virginia Code provides in pertinent part that "[i]n any action at law or suit in equity, the verdict of the jury, or if no jury the judgment or decree of the court, may provide for interest on any principal sum awarded, or any part thereof, and fix the period at which the interest shall commence." Va. Code Ann. § 8.01-382 (Michie 1992). Whether prejudgment interest should be awarded under § 8.01-382 is a matter within the sound discretion of the district court. See Hannon Armstrong & Co. v. Sumitomo Trust & Banking Co., 973 F.2d 359, 369 (4th Cir. 1992); Dairyland Ins. Co. v. Douthat, 449 S.E.2d 799, 801 (Va. 1994). The district court held that Hitachi was entitled to prejudgment interest on the outstanding balance of the Project Star loans, and Signet has not appealed that determination. The only issue for us to resolve, therefore, is whether the district court applied the correct prejudgment interest rate.

With regard to the correct prejudgment interest rate, the Virginia Code provides in relevant part that

> The judgment rate of interest shall be an annual rate of nine percent, except that a money judgment entered in an action arising from a contract shall carry interest at the rate lawfully charged on such contract, or at nine percent annually, whichever is higher. Interest at the judgment rate, where no rate is provided by contract, shall apply to [] prejudgment interest pursuant to § 8.01-382.

Va. Code Ann. § 6.1-330.54 (Michie 1993) (emphasis added). According to the statute, when a district court makes an award of prejudgment interest, it should award the higher of nine percent or the rate set in the contract. The rates set in the Assignment Agreements -- 6.55% in the December Assignment Agreement and 6.35% in the January Assignment Agreement -- were clearly lower than nine percent. The district court erred as a matter of law in not awarding Hitachi prejudgment interest of nine percent. We therefore remand the case to the district court with instructions to award Hitachi prejudgment interest of nine percent on the balance of both loans.

B.

Federal law, rather than state law, governs the calculation of post-judgment interest in diversity cases. See Forest Sales Corp. v.

28

<u>Bedingfield</u>, 881 F.2d 111, 113 (4th Cir. 1989). The applicable federal statute provides in relevant part that

> Interest shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment.

28 U.S.C.A. § 1961(a) (West 1994). The district court erred as a matter of law both in applying state law and in applying the statutory rate only on the balance of the loans rather than the entire judgment. We therefore remand the case to the district court with instructions to calculate the proper rate of postjudgment interest on Hitachi's entire money judgment pursuant to 28 U.S.C.A. § 1961.

VI.

In sum, we affirm the district court's grant of summary judgment in favor of Hitachi on Hitachi's breach of contract claims and the district court's refusal to award Hitachi attorneys' fees and costs for collateral litigation with third parties. We reverse the district court's dismissal of Hitachi's fraud claims and the district court's calculation of pre- and postjudgment interest on Hitachi's monetary award. We remand this case to the district court with instructions to reinstate Hitachi's fraud claims and to calculate and award pre- and postjudgment interest in a manner consistent with this opinion.

<u>AFFIRMED IN PART, REVERSED IN PART, AND REMANDED</u>

29