**In re E. Dean MORLEY, Debtor.**

**Atcco Mortgage, Inc., Movant,**

v.

**E. Dean Morley, Respondent.**

**No. 01–12913–JMD.**

United States Bankruptcy Court,
D. New Hampshire.

April 18, 2003.

Richard Montague, Wells, Moore, Simmons & Hubbard, PLLC, Jackson, MI, for Movant.

Charles Gallagher, Haughey, Philpot & Laurent, P.A., Laconia, NH, for Movant.

Grenville Clark, Gray Wendell & Clark P.C., Manchester, NH, for Respondent.

*MEMORANDUM OPINION*

J. MICHAEL DEASY, Bankruptcy Judge.

## I. INTRODUCTION

The Court has before it a motion by Atcco Mortgage, Inc. ("Atcco" or the "Movant") seeking rescission of a Sale and Settlement Agreement (the "Settlement Agreement") for fraud, and disbursement of funds to Atcco from the sale of the Debtor's half interest in real property located in Fairfax County, Virginia (the "Fairfax Property") (Doc. No. 46) (the "Motion to Disburse Funds"). The Debtor filed an objection to Atcco's Motion to Disburse Funds (Doc. No. 62) (the "Objection"), denying the fraud allegation and asserting that no funds should be disbursed to Atcco because the judgment at

issue has been satisfied in full under the terms of the Settlement Agreement.

The Court has before it as well the Debtor's objection to Atcco's two proofs of claim (Doc. No. 49) (the "Objection to Claims"). Atcco's first proof of claim ("POC 7") is for a secured claim of $134,858.94, which represents Atcco's computation of the amount owed by the Debtor under the terms of the Settlement Agreement. Atcco's second proof of claim ("POC 8") is for a secured claim of $2,959,532.10, which represents Atcco's computation of the amount owed by the Debtor if the Court orders rescission of the Settlement Agreement. The Debtor objects to both POC 7 and POC 8.

The Court conducted an evidentiary hearing on these matters on December 5, 2002 (the "Hearing"), and took the matter under advisement. Although most of the issues before the Court at the Hearing should properly have been raised as an adversary proceeding under Fed. R.P. 7001, the parties orally agreed to proceed on the merits at the Hearing. Based on the record before it and for the reasons set forth below, this Court finds that Atcco has failed to prove the fraud necessary to result in rescission of the Settlement Agreement, sustains the Debtor's objection to POC 8, sustains in part Debtor's objection to POC 7, and allows POC 7 in the amount of $120,293.95.

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and the "Standing Order of Referral of Title 11 Proceedings to the United States Bankruptcy Court for the District of New Hampshire," dated January 18, 1994 (DiClerico, C.J.). This is a core proceeding in accordance with 28 U.S.C § 157(b).

## II. FACTS

The Settlement Agreement at issue in this case was executed by Atcco's prede-cessor-in-interest, Land Fund II Limited Partnership ("Land Fund"), and E. Dean Morley (the "Debtor") and his wife Merry Morley (collectively, the "Morleys") in 1996 to resolve satisfaction of a judgment held by Land Fund in the amount of approximately a million and a half dollars. At that time, the Morleys were debtors in a Chapter 11 proceeding in the Eastern District of Virginia (the "Virginia Bankruptcy"). Prior to execution of the Settlement Agreement, the Debtor represented to Land Fund that he did not own the real property located at 135 Krainewood Drive, Moultonboro, New Hampshire (the "New Hampshire Property" or the "Property"), but merely held it as trustee on behalf of Jerdart Associates II (the "Partnership"). Atcco now seeks rescission of the Settlement Agreement on the grounds that during negotiation of the Settlement Agreement and in his Virginia Bankruptcy schedules and statement of financial affairs, the Debtor fraudulently concealed the true nature of his ownership interest in the Property.

On September 22, 1988, the Debtor's four children formed the Partnership and filed a certificate of partnership with the Commonwealth of Virginia. On the same date, the Partnership executed a power of attorney document granting the Debtor "complete authority to act on behalf of the partnership in all matters relating to the partnership until rescinded by the partnership" (the "Power of Attorney"). The Debtor testified that the plan was for the Debtor to use his funds to purchase the New Hampshire Property and create a camp. The Partnership would reimburse his expenditures at a later date, record the Partnership in New Hampshire, and pay the taxes on any profit made by the Debtor. The Debtor testified that he did not record the Partnership in New Hampshire

because he did not want to create a problem with the IRS as the New Hampshire Property was initially purchased with the Debtor's own funds and would not belong to the Partnership until the Debtor was paid in full.

The Debtor did in fact purchase the New Hampshire Property with his own funds in 1989, with title resting in the Debtor's name as trustee for the Partnership. The Debtor named the Property "Camp Atlast." However, the Partnership never obtained the financing by which it intended to repay the Debtor's expenditures and take ownership of the Property, and the Partnership was never recorded in New Hampshire. Since October of 1997, the Debtor has resided at the New Hampshire Property with his wife; the Property is no longer known by the name of Camp Atlast. Title remained with the Debtor as trustee until September 17, 2001, when on the eve of filing his Chapter 13 bankruptcy petition with this Court, the Debtor as trustee conveyed title to himself as an individual by quitclaim deed. The Debtor values the New Hampshire Property at $875,000.00 and has claimed a homestead exemption in it.

The Morleys jointly filed the Virginia Bankruptcy on April 23, 1996. Prior to filing, the Morleys had defaulted on a note to which Land Fund had become successor-in-interest. The note was secured by a mortgage on property in Prince William County. After the Debtor defaulted on the note, Land Fund foreclosed on the property and then continued with a collection action to recover the remaining amount owed, which was approximately a million and a half dollars. Land Fund identified several additional properties in which the Morleys appeared to have a property interest: property located in McLean, Virginia (the "McLean Property"); the Fairfax Property; the New Hampshire Property; and the Debtor's half interest in an abandoned hotel in Mississippi (the "Mississippi Property"). Land Fund obtained a judgment in Virginia for the remaining amount owed under the note (the "Virginia Judgment"). The Virginia Judgment was recorded in New Hampshire by local counsel who was in the process of pursuing an execution on the Virginia Judgment against the New Hampshire Property when the Morleys filed their Virginia Bankruptcy.

At some point during the New Hampshire proceedings seeking execution on the Virginia Judgment, the Debtor provided sworn testimony in the form of answers to Land Fund's interrogatories in which the Debtor represented that the New Hampshire Property was held in trust and not owned by the Debtor individually. As further evidence to Land Fund that he held the New Hampshire Property in trust, the Debtor produced the Partnership Agreement, the title to the Property in his name as trustee, and the Virginia Bankruptcy schedules and statement of financial affairs in which the Debtor represented that the New Hampshire Property was owned by the trust.

The Settlement Agreement which Atcco now seeks to rescind was executed between the Morleys and Land Fund in November of 1996 to resolve the motion for relief Land Fund had filed in the Virginia Bankruptcy seeking permission to continue with the collection proceedings. The Settlement Agreement identifies the Morley's assets as the McLean Property, the Fairfax Property, and the Mississippi Property. Land Fund specifically agreed to release its lien against the New Hampshire Property because it believed that the Property did not belong to the Debtor individually. In his testimony, Murphy explained that the Settlement Agreement contemplated the Debtor's orderly liqui-

dation of the named assets; the Debtor was given a period of time in which to sell the various properties and pay Land Fund $350,000.00 plus expenses and a $50,000.00 penalty if the Debtor failed to sell the properties. Any excess amounts generated by the sales would accrue to the Debtor's benefit. The Debtor in fact failed to act to sell the properties by the deadline, and he was assessed the $50,000.00 penalty, thus raising his obligation to $400,000.00 plus expenses.

Murphy further testified that Land Fund had agreed to accept less money than was owed and to release the lien against the New Hampshire Property only because Land Fund believed that the Debtor had no ownership interest in that Property. This belief, he explained, was based on representations the Debtor made under sworn testimony in the interrogatory answers and in the Virginia Bankruptcy schedules and statement of financial affairs. On cross examination, Murphy testified that Land Fund's interrogatories had been generated in an attempt to "untangle the spaghetti of ownership" with regard to the New Hampshire Property. Murphy further testified that although "the spaghetti of ownership" was known to Land Fund prior to entering into the Settlement Agreement, Land Fund had abandoned its pursuit of a lien against the New Hampshire Property because Land Fund's Virginia counsel had advised that it would be "an uphill battle" to establish that the Debtor owned the New Hampshire Property in an individual capacity.

The Debtor filed a Chapter 13 bankruptcy petition with this Court on September 18, 2001. On February 4, 2002, Atcco filed POC 7 for a secured claim in the amount of $134,858.94, representing Atcco's computation of the amount owed by the Debtor under the terms of the Settlement Agreement. On July 31, 2002, Atcco filed POC 8 for a secured claim in the amount of $2,959,532.10, representing Atcco's computation of the amount owed by the Debtor if the Court orders recission of the Settlement Agreement. Also on July 31, 2002, this Court authorized the sale of the Debtor's half interest in the Fairfax Property, by agreement of the parties, with the proceeds to be held pending a resolution of the matters discussed in this opinion.

The Debtor objected to POC 7 and POC 8 in his November 5, 2002 Objection to Claims. Regarding POC 7, the Debtor asserts that it was paid in full upon completion of the sheriff's sale held September 28, 2001 (the "Sheriff's Sale"), at which Atcco paid $162,656.00 for the Debtor's half ownership interest in the Mississippi hotel. The Debtor contends that under the terms of the Settlement Agreement and as detailed in a letter dated March 17, 1998 from Land Fund (the "Confirming Letter"), the proceeds of the Sheriff's Sale satisfied Atcco's claim in full. The Debtor states that the balance of Atcco's claim appears to be for attorney's fees, payment of delinquent taxes and other costs and expenses; the Debtor maintains that neither the Settlement Agreement nor the Confirming Letter state that the Debtor is required to pay such taxes and expenses. Finally, the Debtor asserts that Atcco purchased the Debtor's half interest in the Mississippi Property subject to all liens having priority, including any liens for delinquent real estate taxes and interest and costs associated therewith.

Regarding POC 8, the Debtor asserts that it was filed almost six months after the claims bar date of February 4, 2002, and that it does not amend any prior claim. Additionally, the Debtor states that POC 8 failed to attach any documentation in support of the claim. The Debtor maintains that on information and belief, the claim has been satisfied in full. On November

27, 2002, Atcco filed a Response to Debtor's Objection to the Allowance of Claims (Doc. No. 58), which reiterates the allegations and requests for relief presented in Atcco's Motion to Disburse Funds as discussed below.

On October 28, 2002, Atcco filed the Motion to Disburse Funds, which argues that the Debtor concealed the true nature of his ownership interest in the New Hampshire Property during negotiation of the Settlement Agreement and in the Virginia Bankruptcy schedules and statement of financial affairs. Atcco further argues that the Debtor fraudulently induced Land Fund to enter into the Settlement Agreement in which Land Fund agreed to lower the amount owed by the Debtor and to release its lien on the New Hampshire Property. Accordingly, Atcco seeks rescission of the Settlement Agreement, which would result in restoration of the full amount owing under the note and would reinstate Atcco's judgment lien *nunc pro tunc* to the time of the Settlement Agreement. Additionally, the Motion to Disburse Funds seeks disbursement to Atcco of the net proceeds from the sale of the Debtor's half interest in the Fairfax Property.

On December 2, 2002, the Debtor filed its Objection to the Motion to Disburse Funds. The Debtor denies the fraud allegations and thus argues that the Court should not rescind the Settlement Agreement. The Debtor maintains that he has no further debt obligation to Atcco as the payment of $162,656.00 generated by the sale of the Mississippi Property satisfied the judgment in full under the terms of the Settlement Agreement.

## III. DISCUSSION

### A. Choice of Law

■ Because the Settlement Agreement does not contain a choice of law provision, New Hampshire's conflict of laws rule will determine which state's law governs the rescission issue. In *Consolidated Mutual Insurance Co. v. Radio Foods Corp.*, the New Hampshire Supreme Court adopted the "significant relationship" test as provided in the Restatement (Second) of Conflicts of Law. *Consolidated Mutual Insurance Co. v. Radio Foods Corp.*, 240 A.2d 47, 49, 108 N.H. 494, 496 (1968); *see also Ellis v. Royal Insurance Cos.*, 530 A.2d 303, 306, 129 N.H. 326, 330 (1987); *Restatement (Second) of the Law, Conflicts of Law*, § 188 (1971). More specifically, in *Consolidated Mutual* the court explained that "in the absence of an express choice of law validly made by the parties, the contract is to be governed, both as to validity and performance, by the law of the state with which the contract has its most significant relationship." *Consolidated Mutual*, 240 A.2d at 49 (*citing Restatement (Second), Conflict of Laws* §§ 332, 332a, 332b (Tentative Draft No. 6, 1960)). The court further explained that the aim of the significant relationship inquiry is to heed the parties' intentions and reasonably justified expectations. *Consolidated Mutual*, 240 A.2d at 49 (*quoting* Goodrich and Scoles, *Conflict of Laws* § 106).

■ Section 188(2) of the Restatement (Second) of Conflict of Laws (the "Restatement") provides a nonexhaustive list of the types of contacts to be considered in determining with which state the contract has its most significant relationship. The contacts include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Restatement (Second), Conflict of Laws* § 188(2). For cases involving less complicated contact factors, subsection (3) simplifies the analysis, providing that: "[i]f the place of negotiating the contract and the place of performance are in the same state, the local law of this state will usually be applied." *Id.* § 188(3).

Because the disputes in *Consolidated Mutual* and its offspring, *Ellis v. Royal Insurance Companies*, arose in connection with multiple risk insurance policies, the factors relating to the substantial relationship test were somewhat complicated. In both cases, the court focused its analysis on an additional set of rules in the Restatement that provide specific guidance on the issue of multiple risk insurance policies. *See Consolidated Mutual*, 240 A.2d at 49; *Ellis*, 530 A.2d at 306. The court's analysis in *Consolidated Mutual* and *Ellis* thus turned on determination of which particular risk was the subject of the dispute and in which state the risk was located. *See id.* In both cases the court held that New Hampshire law applied because that was the location of the risk.

 In the instant case, the type of contract in dispute is more traditional and straightforward than those in dispute in *Consolidated Mutual* and *Ellis*, and falls within the parameters of section 188 of the Restatement. At the time the Settlement Agreement was executed, the Debtor was a resident of Virginia and Land Fund's offices were located in Washington, D.C. *See* Exhibit 17. The Settlement Agreement was thus presumably negotiated between the parties in those locations, and executed in one or both locations. The Settlement Agreement calls for performance by the Debtor, living in Virginia, to sell properties located in Virginia and Mississippi, and to send payments to Land Fund at its Washington, D.C. offices. *See id.* The Settlement Agreement was recorded in Fairfax County, Virginia, on October 9, 1997. *See id.* The Movant's Virginia Judgment and the Morleys' Virginia Bankruptcy served as the context for the execution of the Settlement Agreement. *See id.*

Based on these factors, this Court concludes that Virginia is the state with which the Settlement Agreement has its most significant relationship. Although there are contacts involving other states and Washington, D.C., these contacts are minor in number and substance as compared with the amount and nature of contacts with Virginia. As such, this Court concludes that Land Fund and the Debtor intended and reasonably expected the Settlement Agreement to be governed by the laws of the Commonwealth of Virginia. Accordingly, Virginia law will govern this Court's analysis of Atcco's rescission argument.

**B. Rescission**

 In Virginia, a settlement agreement may be rescinded for fraud. *Metrocall of Delaware, Inc. v. Continental Cellular Corp.*, 246 Va. 365, 437 S.E.2d 189, 193 (1993). To prove fraud, the Movant must demonstrate that the Debtor made:

1. an intentional, knowing misrepresentation or concealment

2. of a material fact

3. upon which the Movant reasonably relied

4. to its detriment.

*Id.* In the instant case, Atcco alleges that the Debtor fraudulently concealed his true ownership interest in the New Hampshire Property, and that Land Fund relied on the alleged concealment in negotiating the terms of the Settlement Agreement. Be-

cause there is little controversy regarding the second and fourth elements, the Court will address those elements first and then turn its attention to the more problematic elements that deal with the Debtor's intent and with the reasonableness of Atcco's reliance on the alleged concealment.

### 1. *Materiality*

■■■ Under Virginia law, in order to rescind a settlement agreement for fraud, the Movant must show that the alleged misrepresentation or concealed fact is material to the agreement formed between the parties. *Metrocall,* 437 S.E.2d at 193. At the Hearing, Atcco introduced uncontested evidence demonstrating that the Debtor's alleged concealment of his true ownership interest in the New Hampshire Property materially affected the formation of the Settlement Agreement. Murphy testified that the alleged concealment directly affected the amount of the Debtor's obligation and also affected the extent to which Land Fund's claim was secured. Both items are material to the Settlement Agreement. As a result of the execution of the Settlement Agreement, Land Fund released its judicial attachment on the New Hampshire Property and ceased efforts to enforce the Virginia Judgment in New Hampshire. As Murphy's testimony stands undisputed on this point, the Court finds that the Debtor's alleged concealment is material to the Settlement Agreement.

### 2. *Detrimental Reliance*

■■ The Movant must further show that it relied on the misrepresented or concealed fact to its detriment. *Id.* At the Hearing, Atcco introduced evidence demonstrating that Land Fund relied on the Debtor's alleged concealment to its detriment. Specifically, Murphy testified that Land Fund lost money and released its attachment lien because it mistakenly believed that the Debtor did not own the New Hampshire Property. Murphy stated that the only reason Land Fund agreed to accept less money in satisfaction of the note and to release its lien on the New Hampshire Property is because it believed that the Debtor did not own the Property. As Murphy's testimony stands undisputed on this point, the Court finds that Land Fund relied to its detriment on the Debtor's alleged concealment of the true nature of his ownership interest in the New Hampshire Property.

### 3. *Intentional Misrepresentation*

■■■ The Movant must further demonstrate that the defendant intentionally misrepresented a material fact. *Id.* at 193; *Bank of Montreal v. Signet Bank,* 193 F.3d 818, 827 (4th Cir.1999). Notably, however, the misrepresentation need not be express. *Id.* The Movant may prove fraud by demonstrating that the defendant concealed a material fact knowing that the other party was acting on the assumption that no such fact exists. The concealment, however, must be shown to have been intentional; a showing of reckless concealment is not sufficient. *Bank of Montreal,* 193 F.3d at 827.

In *Metrocall,* the plaintiffs were minority partners who settled a fraud claim they had brought against the defendant general partner. *Metrocall,* 437 S.E.2d at 190. Under the terms of the settlement agreement, the defendant purchased the plaintiffs' interest in the partnership for an agreed sum per unit. *Id.* The plaintiffs later sought to rescind the settlement agreement when they learned that the defendant had sold the entire partnership to a third party for a unit price greater than what the plaintiffs had received under the settlement agreement. *Id.* The plaintiffs alleged that the defendant had fraudulently induced them to enter into the settle-

ment agreement by concealing from them during the settlement negotiations that the majority partners were simultaneously and covertly conducting negotiations with a third party to sell the entire partnership at a higher price. *Id.*

Although Atcco characterizes its allegation as fraudulent concealment, the more appropriate allegation is fraudulent misrepresentation. Unlike the defendant general partner in *Metrocall* who kept silent regarding third party negotiations, the Debtor in the instant case was not silent as to the existence of the New Hampshire Property, but instead made express statements regarding its ownership. More specifically, the Debtor disclosed the existence of the New Hampshire Property in his Virginia Bankruptcy statement of financial affairs, and had extensive exchanges with Land Fund about the Property during the course of their dispute, the New Hampshire litigation and subsequent negotiations leading to the Settlement Agreement. *See* Exhibit 9. It is thus more accurate to characterize the issue as one of fraudulent misrepresentation, although this distinction is ultimately a minor one as it does not change the intent standard or the outcome of the Court's decision.

The Court must next determine whether the Debtor in fact misrepresented his ownership interest in the New Hampshire Property in 1996. As discussed above, the Debtor stated in his Virginia Bankruptcy schedules, statement of financial affairs, and in his interrogatory answers in the New Hampshire litigation that he did not own the New Hampshire Property but merely held the title as a trustee on behalf of the Partnership. *See id.*; Exhibit 16. However, at the hearing Atcco offered the expert testimony of a New Hampshire real estate attorney, J. Jefferson Davis ("Attorney Davis"), who testified that under New Hampshire law the Debtor did in fact own

the Property in 1996. As Attorney Davis' testimony stands undisputed, the Court finds that the Debtor owned the Property in 1996, and that the Debtor therefore misrepresented the true nature of his ownership interest during his negotiations with Land Fund and on his Virginia Bankruptcy schedules and statement of financial affairs.

However, mere misrepresentation is not sufficient to satisfy this element of fraud. The Movant must further demonstrate that the misrepresentation was intentional. *Id.* at 193; *Bank of Montreal v. Signet Bank*, 193 F.3d at 827. Here, Atcco has made no such showing. There is no evidence on the record demonstrating that the Debtor knew that his statements were inaccurate or that he intended to mislead Land Fund. Attorney Davis' testimony only establishes that a New Hampshire real estate and title law expert looking at documents available to the Debtor and the Movant at the time the misrepresentation was made should have been able to determine that a misrepresentation had been made. The Court has been given no basis on which to impute such expert knowledge to the Debtor.

Indeed, the only evidence before the Court relating to the Debtor's knowledge or state of mind is the Debtor's own testimony, which indicates a lack of knowledge or intent regarding the misrepresentation. The Debtor testified that at the time he made the statements he believed that he did not own the New Hampshire Property but merely held it in trust on behalf of the Partnership. The Debtor further testified that he was following the advice of his bankruptcy attorneys in describing the Property as he did in the schedules, and that he had made a good faith effort to disclose the details of the transaction to his attorneys as well as to Land Fund.

Specifically, when questioned about the veracity of his Virginia Bankruptcy schedules, the Debtor testified that "[e]verybody knew what I was trying to do, and that's the way the lawyers prepared the documents for the court. I had no problem signing it; that was their direction, their program as they looked at all that I had and all that I was doing." The Debtor further explained that he had told Land Fund that he would not record the Partnership at that time because he did not want to create problems with the IRS as the Property had been purchased with his money and "would not be [the Partnership's] until [the Debtor] was fully paid." Finally, when asked directly whether he believed he had made false statements under oath, the Debtor responded: "No." Atcco put on no evidence to dispute the Debtor's testimony. Accordingly, the Court finds that the Movant has failed to demonstrate that the Debtor intentionally or recklessly misrepresented the true legal nature of his ownership interest in the New Hampshire Property.

### 4. *Reasonable Reliance*

▮▮▮▮ Lastly, to prove fraud the Movant must show that its reliance on the defendant's misrepresentation was reasonable and justified. *Metrocall*, 437 S.E.2d at 193. Reliance on a misrepresentation is unreasonable where the plaintiff was on notice of the misrepresentation before entering into the agreement. *Id.* at 195; *Bank of Montreal*, 193 F.3d at 827. More specifically, the Fourth Circuit explained that the test for reasonableness is prudent investigation. *Bank of Montreal*, 193 F.3d at 827; *Hitachi Credit America Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999). A plaintiff who undertakes a full investigation, or makes a partial inquiry with full opportunity to complete an investigation, cannot later claim reasonable or justifiable reliance on the misrepresentation. *Id.*

In *Metrocall*, the Virginia Supreme Court found that plaintiff minority partners relied unreasonably on representations by the defendant managing partner where the agreement settled an underlying fraud case. *Metrocall*, 437 S.E.2d at 194–95. Under the terms of the settlement agreement, the plaintiffs assigned their interests to the majority group for a certain sum per unit. *Id.* at 190. During negotiation of the settlement agreement, however, the defendant concealed from the plaintiffs the fact that the majority partners had made a deal to sell the entire partnership to a third party for a greater sum per unit than the plaintiffs received under the settlement agreement. *Id.* Because the underlying dispute in *Metrocall* was a fraud case, the settlement agreement specifically released the defendant and promised not to sue for failure to disclose material facts or for misrepresentation. *Id.* at 194. In finding that the plaintiffs' reliance on the concealment was unreasonable, the court explained that a party "negotiating or attempting to compromise an existing controversy over fraud, dishonesty, and self-dealing [ . . . ] is unreasonable to rely on the representations of the allegedly dishonest party." *Id.* at 195. Thus, the *Metrocall* court implicitly reasoned that the plaintiffs' reliance was unreasonable because their allegations regarding the defendant's previous dishonest activity had put them on notice not to rely on representations made by the defendant. *See id.*

▮▮▮ In *Hitachi*, the Fourth Circuit found that the plaintiff was reasonable in relying on the defendant's representations because the plaintiff had conducted prudent investigation and the general disclaimer of warranties and liabilities did not bar the fraud suit. *Hitachi*, 166 F.3d at 630. There, the plaintiff was a participat-

ing bank that sued the lead bank for fraud; the plaintiff had suffered losses in connection with its participation in the defendant's credit facility that was created to finance a third party's project. Unbeknownst to the defendant, the third party's project was fictitious. *Id.* at 619–20. Calling prudent investigation the "touchstone" of reasonableness, the *Hitachi* court explained that:

> under Virginia law reliance on a false representation is not justified where the relying party fails to undertake a prudent investigation and specifically disclaims reliance on that very representation in a contract.

*Id.* at 630. Explaining that the plaintiff had investigated matters of which it had notice and ability to investigate, the court found that the plaintiff in *Hitachi* had taken all prudent steps to investigate the underlying transaction. The court noted as well that the defendant had prevented the plaintiff from conducting further investigation because it had failed to disclose additional facts that would have indicated a need for further investigation. Moreover, a confidentiality agreement between the plaintiff and the defendant prevented the plaintiff from seeking information elsewhere. *See id.*

In *Bank of Montreal,* the defendant alleged fraud arising out of the same loan scheme at issue in *Hitachi.* In *Bank of Montreal,* however, the Fourth Circuit found that the plaintiff's reliance was not reasonable. *Bank of Montreal,* 193 F.3d at 831. There, the participation agreement was significantly different from the one at issue in *Hitachi.* Rather than providing a general waiver, the *Bank of Montreal* agreement provided that the defendant was not responsible for the "genuineness" of documents relating to the fraudulent third party, and provided broad disclaimers. *Id.* at 830. Given the lack of

protection afforded by the agreement and the plaintiff's lack of investigation, the court concluded that the plaintiff's reliance on the defendant's restated information derived from the fraudulent third party was unjustifiable. *Id.*

The court went on to explain that despite the findings described above, the plaintiff's reliance could still be reasonable if the defendant took the plaintiff "off its guard." *Id.* at 831 (*citing Hitachi,* 166 F.3d at 630 (explaining that the defendant had prevented the plaintiff from conducting further investigation by failing to disclosure additional facts that would have indicated the need for further investigation)). The court explained that unlike *Hitachi,* the plaintiff in *Bank of Montreal* did have information that should have indicated the need for further investigation, and there was no confidentiality agreement between the parties preventing the plaintiff from seeking such information. *Id.* Thus, unlike the plaintiff in *Hitachi,* the plaintiff in *Bank of Montreal* relied unreasonably on the defendant's representations because it had not pursued all avenues of investigation that it was on notice to pursue.

██ The reported decisions under Virginia law appear to utilize the words "reasonable" and "justifiable" reliance interchangeably. The United States Supreme Court recently recognized that under the Restatement (Second) of Torts, justifiable and reasonable reliance are not the same thing. *Field v. Mans,* 516 U.S. 59, 70–71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Reliance that is justifiable may not be reasonable. *Id.* The vast majority of the states only require justifiable rather than reasonable reliance. *Field,* 516 U.S. at 72–73, nn. 10–12, 116 S.Ct. 437. However, Virginia is one of the minority of states that requires reasonable reliance in order to establish fraud. *Horner v. Ahern,* 207

Va. 860, 153 S.E.2d 216, 219 (1967) (explaining that a party must use ordinary care and prudence to investigate representations of fact when the means to determine the accuracy of the facts is equally available to both parties); *Poe v. Voss,* 196 Va. 821, 86 S.E.2d 47, 50 (1955) (explaining that where a party obtains information that is sufficient to excite the suspicions of a reasonably prudent man, he is then under a duty to ascertain the true condition for himself and cannot rely on the representations of the other party).

Unlike *Metrocall,* the underlying dispute in the instant case was not one of dishonesty or fraud. The underlying dispute in the instant case that was the subject of the Settlement Agreement was a collection action. Land Fund's reliance on representations made by the Debtor are therefore not per se unreasonable. *See Metrocall,* 437 S.E.2d at 195. Moreover, the Settlement Agreement does not release the Debtor or promise to sue for failure to disclose material facts or for misrepresentation. *See id.* at 194. However, Land Fund did have knowledge of the issue of the true status of the New Hampshire Property prior to entering the Settlement Agreement. Land Fund had commenced litigation in New Hampshire against the Debtor in 1995 in an attempt to enforce the Virginia Judgment against the New Hampshire Property. In March, 1996, Land Fund served interrogatories on the Debtor in the New Hampshire litigation questioning the status of the Partnership, the Debtor's role in connection with it, and other issues relating to the Debtor's ownership interest in the New Hampshire Property. *See* Exhibit 16. In fact, during his testimony, Murphy conceded that Land Fund had been aware of the "spaghetti of ownership" even prior to the filing of the Virginia Bankruptcy. According to Murphy's testimony, however, upon advice of counsel that "it would be an uphill battle to say that Dean Morley owned this property personally," Land Fund abandoned its pursuit of the matter and entered into the Settlement Agreement despite its misgivings regarding the Debtor's ownership interest in the New Hampshire Property.

Atcco's present (and successful) effort to demonstrate that the Debtor in fact owned the Property in 1996 rests mainly on Attorney Davis' expert testimony. As discussed above, Attorney Davis testified that at the time the Debtor filed his Virginia Bankruptcy schedules, under New Hampshire law the Debtor owned the New Hampshire Property in an individual rather than trustee capacity. More specifically, Attorney Davis explained that under New Hampshire law, to establish a trust it must be in writing; because there is no writing establishing a trust in this case, no trust existed. Moreover, the Power of Attorney does not establish a trust; it authorizes the Debtor to act on behalf of the Partnership, but does not establish a written trust such that the Debtor could hold property on behalf of the Partnership. Attorney Davis further explained that in order for property to be partnership property, it must be paid for by partnership assets; in this case the Property was paid for with the Debtor's personal assets. Finally, Attorney Davis testified that the mere conveyance the Property to the Debtor as a trustee "gets you nothing;" the deed is in fact to an individual if, as in this case, there is no trust in existence.

In reaching his conclusions, Attorney Davis relied solely on documents that existed prior to the negotiation and execution of the Settlement Agreement and that were known, or readily available, to Land Fund. Those documents include the Partnership Agreement, the Power of Attorney, the 1989 deed, and the absence of a trust instrument. Thus, Land Fund either (1) relied on the Debtor's misrepre-

sentation despite having notice and having undertaken a partial investigation of the misrepresented fact, or (2) relied on the advice of its own counsel prior to execution of the Settlement Agreement. As Land Fund's predecessor-in-interest, Atcco cannot under these facts claim that Land Fund was "taken off its guard" with respect to the Debtor's ownership interest in the New Hampshire Property. *See Bank of Montreal*, 193 F.3d at 831. Land Fund's decision not to complete its investigation or further pursue its interest in the matter was imprudent; the Court therefore finds that Land Fund's reliance on the Debtor's misrepresentation was unreasonable.* Accordingly, the Court finds that the Movant has failed to prove the fraud necessary to warrant rescission of the Settlement Agreement.

## C. Determination of Atcco's Allowed Claim

### 1. *Claim No. 7*

On February 4, 2002, Atcco filed POC 7 in the amount of $134,858.94, which represents costs, expenses, delinquent taxes, and attorneys fees (the "Claimed Expenditures") that Atcco claims were incurred in connection the pursuit of its creditor's rights against the Mississippi Property. In his Objection to Claims, the Debtor argues that the Sheriff's Sale of the Mississippi Property satisfied the Debtor's obligation to Atcco in full, and that neither the Settlement Agreement nor the Con-

firming Letter require the Debtor to pay for the Claimed Expenditures. The Debtor further asserts that the Debtor is not required to pay for the delinquent taxes because the Mississippi Property was sold subject to all liens. Because the Objection to Claims sufficiently rebuts Atcco's claim, the burden shifts back to Atcco to prove that it is entitled to payment for the Claimed Expenditures.

POC 7 indicates that the claim is secured, but to an uncertain amount. Under Bankruptcy Rule 3001(f), a proof of claim executed and filed in accordance with the requirements of Rule 3001 shall constitute prima facie evidence of the validity and amount of the claim. Such requirements include that evidence of perfection of any security interest be attached. Here, Atcco does not attach a copy of the mortgage, but simply states that the claim is secured by the Fairfax Property. However, in the absence of any objection by the Debtor, the Court will nonetheless treat POC 7 as prima facie evidence of Atcco's claim to a secured claim.

The issue of whether Atcco is entitled to payment for the Claimed Expenditures is determined by the terms of the Settlement Agreement. Paragraph 12 of the Settlement Agreement provides that if Land Fund does not net $350,000 from the sale of the McLean Property (after deducting costs), then Land Fund will be permitted to pursue its creditor's rights against the Mississippi Property.[1] *See* Exhibit 17. It

---

* Under the circumstances of this case, it does not make any difference whether the standard for reliance is reasonable or the lower standard of justifiable. The Court would also find that any reliance by Land Fund upon the Debtor's representations concerning title to the New Hampshire Property was unjustifiable.

1. Paragraph 12 states: "If [ . . . ] Land Fund II does not net $350,000 from the sale of the McLean Property (after deducting the cost of

sale, including realtor's and attorney's fees, settlement costs, if any, and related expenses and costs) ('The $350,000 Plus Costs') then Land Fund Will be permitted to pursue its creditor's rights against the Mississippi Property. If such action is taken, *after the payment of all costs, expenses and attorney's fees and all liens from the sale of the Hotel Property*, Land Fund will first be paid the difference between the $350,000 Plus Costs as described above and the amount actually received from

further provides that if such action is taken, the sale proceeds from any sale of the Mississippi Property are to be applied first to all costs, expenses, attorney's fees, and liens associated with such sale (the "Reimbursable Expenditures"). *See id.* Next, from the sale proceeds Land Fund is to be paid the amount of the McLean Property shortfall plus the $50,000.00 penalty. Any remaining proceeds belong to the Debtor. *See id.*

As it turned out, Land Fund did not net $350,000 from the sale of the McLean Property. *See id.* Moreover, the Debtor had incurred an additional $50,000 obligation pursuant to an order by the court in the Debtor's Virginia Bankruptcy. *See id.* The Confirming Letter provides a clear breakdown of the Debtor's obligation to Atcco subsequent to the sale of the McLean Property:

| | |
|---|---|
| $350,000 | Former McLean [Property] payoff |
| 237,344 | Less the sales proceeds from McLean [Property] |
| $112,656 | |
| 50,000 | Add Additional [Penalty] amount required by BK Court |
| $162,656 | Balance to be collected from Morley interest in [Mississippi Property] |

*Id.* The Debtor does not dispute these calculations. Therefore, the sale proceeds from the Debtor's half interest in the Mississippi Property are first to be applied to the Reimbursable Expenditures, and then applied in satisfaction of the $162,656.00 shortfall. *See id.*

At the Sheriff's Sale, the Debtor's half interest in the Mississippi Property was sold to Atcco for $162,656.00. *See* Exhibit 23. The Court notes that the sale proceeds are exactly equal to the amount of the McLean Property shortfall. Thus, although the Settlement Agreement provides that the Mississippi Property sale proceeds are to be applied first to the Reimbursable Expenditures, for ease of computation and analysis the Court will treat the proceeds as having fully satisfied the shortfall.[2] The Court is thus left to determine the extent to which Atcco's claim of $134,858.94 for the Claimed Expenditures should be allowed, and the extent to which any allowed claim is secured.

As discussed above, the Settlement Agreement provides that Atcco is entitled to payment for Reimbursable Expenditures associated with the sale of the Mississippi Property. *See* Exhibit 17. Because Atcco was both the seller and the buyer in this transaction, it is important to distinguish between expenditures Atcco made when acting as the seller versus expenditures it made when acting as the buyer. Under the Settlement Agreement, Atcco is entitled only to payment for expenditures it made as the seller; Atcco is not entitled to payment for any expenditures it made as the buyer at the Sheriff's Sale. *See id.* Accordingly, the Court shall allow Atcco's claim as set forth in POC 7 only to the extent it has demonstrated that the Claimed Expenditures were incurred in its capacity as seller.

The chart below reflects the breakdown of Atcco's claim as provided on the attachment to POC 7, and identifies which items the Court shall allow and disallow. A

the sale of the McLean Property and an additional $50,000. The balance of any proceed thereafter from any sale of the Hotel Property will go to Morley." (emphasis added)

2. POC 7 itself appears to treat the claim in the same manner, requesting payment for costs, expenses, attorney's fees and the tax lien with no mention of any payment owing on the McLean Property shortfall.

fuller discussion of the Claimed Expenditures follows.

| | | |
|---|---|---|
| First American Title | 300.00 | DISALLOWED |
| Jim Pierce | 2,879.31 | DISALLOWED |
| Brad Evans | 912.00 | DISALLOWED |
| Cotton Bledsoe | 357.00 | DISALLOWED |
| Delinquent Taxes | 94,229.43 | ALLOWED |
| Wells Moore | 28,134.74 [3] | ALLOWED IN PART (18,022.56) |
| Hinds Co. Sheriff | 5,695.96 | ALLOWED |
| Haughey, Philpot & Laurent | 2,350.50 [4] | ALLOWED IN PART (2,346.00) |

Atcco's claim for the $300 it paid to First American Title represents the cost of obtaining a title report. This claim is disallowed because title searches are typically the responsibility of the buyer rather than the seller in a real estate transaction and Atcco offered no evidence that it incurred such costs as the seller.

Atcco's claims for $2,879.31, $912.00, and $357.00 represent fees for Jim Pierce, Brad Evans, and Cotton Bledsoe respectively. The claims are disallowed because Atcco failed to demonstrate that these fees were associated with actions Atcco took in its capacity as seller. There is no evidence on the record establishing the connection of Jim Pierce, Brad Evans or Cotton Bledsoe to the sale of the Mississippi Property.

Atcco's claim for $94,229.43 represents the amount it paid for delinquent real estate taxes on the Mississippi Property. In his Objection to Claims, the Debtor argues that Atcco is not entitled to payment for the delinquent taxes because the Mississippi Property was sold subject to all liens.

Although the Debtor is correct that the Mississippi Property was sold subject to all liens, at the time of the Sheriff's Sale the Mississippi Property was no longer subject to the $94,229.43 tax lien. On August 30, 2001, approximately one month before the Sheriff's Sale, Atcco paid $94,229.43 to Hinds County to satisfy the tax lien and redeem the Mississippi Property which had been sold to the state on August 30, 1999. *See* Exhibit 24. At the Hearing, Atcco's President Craig Atchison ("Atchison") testified that Atcco had paid the delinquent taxes because the Mississippi Property was going to be lost to the tax authority. Atcco paid the tax to protect the Mississippi Property. The Court finds that such an action is consistent with Atcco's rights under the Settlement Agreement, and that the Settlement Agreement entitles Atcco to payment for paying the tax lien. Atcco's claim for payment of the $94,229.43 it expended for delinquent property taxes is allowed.

Atcco's claim for $28,134.74 represents attorneys fees for work performed by

**3.** At the Hearing, Atcco introduced into evidence an updated fee statement showing that Wells Moore attorney's fees had risen from $28,134.74 to $44,240.99. *See* Exhibit 27.

**4.** At the Hearing, Atcco introduced into evidence an updated fee statement showing that Haughey, Philpot & Laurent attorney's fees had risen from $2,350.50 to $8,215.00. *See* Exhibit 28.

Richard Montague ("Attorney Montague") and other attorneys at Wells, Moore, Simmons & Hubbard, PLLC ("Wells Moore"). Wells Moore represents Atcco in the matter before the Court. At the Hearing, Atcco asserted that the amount of the Wells Moore fees which are chargeable to the Debtor have risen to $44,240.99, and introduced into evidence the Statement of Attorney Montague in Support of Atcco's Proof of Claim ("Attorney Montague's Statement"). *See* Exhibit 27. Although Atcco has failed to file an amended proof of claim reflecting the increased amount of its claim, the Court will consider the increased claim.

The Settlement Agreement determines the scope of the Debtor's obligation to pay Atcco's attorney's fees and expenses. Paragraph 12 of the Settlement Agreement limits the Debtor's obligation to "all costs, expenses and attorney's fees and all liens from the sale of the [Mississippi] Property." Exhibit 17. As the reasonableness of the fees is not in dispute, the Court will allow all attorney's fees and expenses which are directly related to work performed for the protection and pursuit of Atcco's creditor's rights against the Mississippi Property. Fees and expenses are disallowed where the work performed relates to Atcco's purchase of the Mississippi Property, Atcco's fraud and rescission argument, and both allowable and disallowable matters where there is no basis on which to allocate time. See Exhibit A for an itemization of the disallowed fees and expenses of Wells Moore.

Because Atcco failed to provide the hourly fee rates of the Wells Moore attorneys who performed work in this case, the Court has calculated such fee rates where possible. Of the four exhibits constituting Wells Moore time entries which are attached to Attorney Montague's Statement, only Exhibits 2 and 4 provide a basis for such calculation by providing a dollar amount next to the hours spent for each entry. As such, the Court calculated the hourly fee rates for attorneys identified as SAC, KPT, and RAM by dividing the fee amount by the hours worked for one time entry of each attorney provided in Exhibit 2. *See* Exhibit 27. The Court did not need to calculate the fee rates of SB and GL based on the information provided in Exhibit 4, as none of the fees of SB or GL are allowed. Because the Court was provided no information from which to discern the hourly fee rates of attorneys identified as JTK and PLD, the Court has assigned a pay rate of $110 per hour, which represents the lowest of the fee rates as between the attorneys identified as SAC, KPT, SB, GL, and RAM. In applying the above rationale, $17,946.50 of the claimed fees and $76.06 of the claimed expenses are allowed.

Atcco's claim for the $5,695.96 it paid to the Hinds County Sheriff represents costs associated with the Sheriff's Sale of the Mississippi Property. More specifically, it represents the sum of $4,882.68 for the sheriff's fee and 813.28 for the clerk's fee. *See* Exhibit 23. Because these costs were incurred by Atcco in its capacity as seller, the claim for $5,695.96 is allowed.

The final item on POC 7 is a claim in the amount of $2,350.50, which represents attorney's fees for Charles Gallagher ("Attorney Gallagher") of Haughey, Philpot & Laurent. Attorney Gallagher serves as local counsel to Atcco in the matter before the Court. At the Hearing, Atcco asserted that the amount of Attorney Gallagher's fees have risen to $8,215.00 and expenses have risen to $265.00. Although Atcco has failed to file an amended proof of claim reflecting the increased amount of its claim, the Court will consider the increased claim. Atcco introduced into evidence the Affidavit of Attorney Gallagher

in support of Atcco's proof of claim ("Attorney Gallagher's Affidavit"), which provides an itemization of time spent between October 16, 2001 and December 4, 2002. *See* Exhibit 28. As the reasonableness of the fees is not in dispute, the Court will allow fees and expenses according to the same rationale articulated above regarding Atcco's claim for Wells Moore fees and expenses. In applying the above rationale, $2,235.00 of the claimed fees and $55.50 of the claimed expenses are allowed. See Exhibit B for an itemization of which entries were disallowed.

The total amount of Atcco's allowed claim under POC 7 is $120,293.95. This allowed claim is fully secured by proceeds from the sale of the Debtor's half interest in the Fairfax Property.

### 2. *Claim No. 8*

On July 31, 2002, Atcco filed POC 8 in the amount of $2,959,532.10, which represents the amount Atcco contends it would be owed if the Court granted Atcco's motion to rescind the Settlement Agreement. In its Objection, the Debtor asserts, among other defenses, that the claim is untimely filed because it was filed almost six months after the claims bar date and does not amend any prior claim. In its Response to the Debtor's Objection, Atcco argues that POC 8 and POC 7 represent the same claim, and that POC 8 in fact amends POC 7 and therefore was timely filed.

In light of the Court's denial of Atcco's motion to rescind the Settlement Agreement, it is not necessary to reach the issue of timeliness of POC 8. Atcco's claim for the amount that would have been due and owing under the original loan obligation is disallowed as moot after denial of the Motion to Disburse Funds and the partial allowance of POC 7.

### III. CONCLUSION

For the reasons stated above, the Court DENIES Atcco's Motion to Disburse Funds to the extent that it seeks rescission of the Settlement Agreement and disbursement of funds to satisfy the original note and OVERRULES in part and SUSTAINS in part the Debtor's Objection to Claims. The Court shall issue a separate order. This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

**EXHIBIT A**

**DISALLOWED WELLS MOORE FEES AND EXPENSES**

Fees

| Date | Attorney | Hours |
|------|----------|-------|
| 8/28/01 | SAC | 4.0 |
| 8/29/01 | RAM | 4.8 |
| 9/19/01 | SAC | 6.6 |
| 9/19/01 | RAM | 2.2 |
| 9/20/01 | SAC | 3.1 |
| 9/20/01 | RAM | 1.5 |
| 9/21/01 | RAM | 0.4 |

**464**

Fees

| Date | Attorney | Hours |
|------|----------|-------|
| 9/26/01 | SAC | 1.5 |
| 9/27/01 | RAM | 4.8 |
| 9/28/01 | KPT | 5.8 |
| 9/28/01 | RAM | 5.5 |

[9/30/01 through KPT 10/15/01 fees were excluded by Attorney Montague]

| 10/15/01 | RAM | 1.9 |
| 10/18/01 | RAM | 0.3 |
| 10/23/01 | RAM | 6.4 |
| 10/23/01 | SAC | 2.2 |

All entries from 9/9/02 through 12/4/02

Expenses

All entries from 10/01/01 through 10/15/01

**EXHIBIT B**

**DISALLOWED ATTORNEY GALLAGHER'S FEES AND EXPENSES**

Fees

All entries from 2/1/02 through 12/4/02

Expenses

All entries from 6/26/02 through 11/21/02